268 F.3d 1075 (D.C. Cir. 2001)
 State of Michigan, Michigan Department of Environmental Quality, Petitioner
v.
Environmental Protection Agency, Respondent
Navajo Nation, Intervenor
 No. 99-1151 Consolidated with 99-1152, 99-1153, 99-1154, 99-1155
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued September 4, 2001
Decided October 30, 2001
 
 On Petitions for Review of a Final Rule of the Environmental Protection Agency
 Henry V. Nickel argued the cause for petitioners. With him on the briefs were Lauren E. Freeman, David S. Harlow, Edmund H. Kendrick, Brian J. Renaud, Susan M. McMichael, Jennifer M. Granholm, Attorney General, State of Michigan, and John Fordell Leone, Assistant Attorney General. Richard S. Wasserstrom entered an appearance.
 Cynthia A. Drew, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were John C. Cruden, Acting Assistant Attorney General, Andrew J. Doyle, Attorney, Anthony F. Guadagno, Attorney, Environmental Protection Agency, and Michael W. Thrift, Attorney. Lois J. Schiffer, Assistant Attorney General, U.S. Department of Justice, and Christopher S. Vaden, Attorney, entered appearances.
 Jill E. Grant was on the brief for intervenor Navajo Nation.
 Before: Ginsburg, Chief Judge, Edwards and Sentelle, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Sentelle.
 Sentelle, Circuit Judge:
 
 
 1
 State of Michigan, et al. (hereinafter petitioners), petition this Court for review of the Environmental Protection Agency's ("EPA") 1999 revisions to the Part 71 federal operating permit program rule, 64 Fed. Reg. 8247 (Feb. 19, 1999) (codified at 40 C.F.R. pt. 71).[1] Petitioners argue that the EPA has exceeded its authority under the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. 7401 et seq. (2000), in proposing to promulgate and administer a federal operating permits program for areas where EPA believes the Indian country status is in question, and in proposing to make state/tribe jurisdictional determinations on a case-by-case basis rather than through notice and comment rulemaking. Because we agree with petitioners that EPA has exceeded its authority, we grant the petition for review.
 
 I. Background
 A. The Clean Air Act and Indian Tribes
 
 2
 The Clean Air Act establishes an intergovernmental partnership to regulate air quality in the United States. Described as an "experiment in federalism," Virginia v. EPA, 108 F.3d 1397, 1408 (D.C. Cir. 1997) (quoting Bethlehem Steel Corp. v. Gorsuch, 742 F.2d 1028, 1036-37 (7th Cir. 1984)), the Act gives EPA responsibility for establishing National Ambient Air Quality Standards ("NAAQS"). 42 U.S.C. 7409; see also Whitman v. American Trucking Ass'ns, 531 U.S. 457, __, 121 S. Ct. 903, 907 (2001). Title V of the 1990 Clean Air Act Amendments gives states responsibility for implementing these standards. See, e.g., 42 U.S.C. §§ 7407, 7410.
 
 
 3
 As part of the 1990 Clean Air Act Amendments, Congress also authorized EPA to "treat Indian tribes as States," thus affording Indian tribes the same opportunity as states to implement the NAAQS within tribal jurisdictions under a Title V program. 42 U.S.C. 7601(d). Title V requires that states submit and obtain EPA approval of a state operating permit program ("SOP") that meets the "minimum elements" set forth under 42 U.S.C. 7661a(d) and EPA regulations promulgated pursuant to 42 U.S.C. 7661a(b). Among the requirements is that the state demonstrate that it has "adequate authority," including jurisdiction, to regulate the emission sources subject to the SOP. Id. at 7661a(d). This same requirement applies to Indian tribes seeking to enact their own implementation plan. Id. at 7601(d).
 
 
 4
 Congress recognized the unique legal status and circumstances of Indian tribes by allowing tribes to be treated as states, but not requiring them to apply to EPA to manage Clean Air Act programs. See id. at 7601(d)(1)(A). Tribes may be treated as states if: they have a governing body; the functions they are to exercise pertain to the management and protection of air resources within the tribe's jurisdiction; and the tribe is capable of carrying out these functions. See 42 U.S.C. 7601(d)(2). No tribe to date has sought to create an implementation plan. In the Tribal Authority Rule ("TAR"), EPA exercised authority under 42 U.S.C. §§ 7601(d)(2), (4) by specifying those portions of the Clean Air Act for which it deemed it appropriate to treat Indian tribes as states, and the requirements necessary for tribes to establish jurisdiction to develop Title V permitting programs. See Indian Tribes: Air Quality Planning and Management, 63 Fed. Reg. 7254 (Feb. 12, 1998) (to be codified at 40 C.F.R. pts. 9, 35, 49, 50, and 81). EPA's interpretation was upheld by this Court in Arizona Pub. Serv. Co. v. EPA, 211 F.3d 1280 (D.C. Cir. 2000), cert. denied, 121 S. Ct. 1600 (2001). Under the TAR a tribe may only develop a Title V permitting program for nonreservation areas if the tribe can demonstrate jurisdiction under federal Indian law. Therefore the TAR provides a procedure for resolving jurisdictional disputes. See 40 C.F.R. 49.9(e).
 
 
 5
 If a state fails to create an EPA-approved implementation plan, or in cases where an approved program is not being properly implemented, Congress requires EPA to "promulgate, administer, and enforce" a federal operating permit program. 42 U.S.C. §§ 7661a(d)(3), (i)(3). Further, in the absence of an EPA-approved tribal implementation program, EPA may adopt a federal implementation program. See 42 U.S.C. 7601(d)(4). However, the parties before us disagree as to the source of EPA's power to enact such a program for Indian country. The EPA claims its "authority under the CAA is based in part on the general purpose of the CAA," which was only supplemented in the Indian tribe context by 42 U.S.C. 7601(d)(4). 64 Fed. Reg. at 8251; see also 62 Fed. Reg. 13748, 13749 (proposed rule and notice) ("Today's notice makes it clear that EPA's implementation of part 71 programs in Indian country is based on EPA's overarching authority to protect air quality within Indian country, not solely on its authority to act in the stead of an Indian Tribe."). In contrast, petitioners essentially contend EPA is merely authorized to act in the shoes of the tribes--providing a federal implementation program for tribes as it would for a state that failed to develop an approved program. In any event, both sides agree that in the absence of a tribal implementation plan, EPA may provide a federal operating plan for lands under the tribe's jurisdiction.
 
 B. Federal Indian Law
 
 6
 Determining tribal jurisdiction is far from straightforward and involves delicate questions involving state and tribal sovereignty. Indeed, state-tribal relations have been a concern since the time of the founding. See The Federalist No. 42 (Madison) ("What description of Indians are to be deemed members of a State, is not yet settled, and has been a question of frequent perplexity and contention in the federal councils."). Under principles of federal Indian law, "Indian country" denotes the geographic scope where "primary jurisdiction ... rests with the Federal Government and the Indian tribe inhabiting it, and not with the States." Alaska v. Native Village of Venetie Tribal Gov't, 522 U.S. 520, 527 n.1 (1998). "Indian country" is defined by statute as "all land within the limits of any Indian reservation," "all dependent Indian communities," and "all Indian allotments." 18 U.S.C. 1151 (2001). "Although this definition by its terms relates only to federal criminal jurisdiction, [the Supreme Court has] recognized that it also generally applies to questions of civil jurisdiction such as the one at issue here." Venetie Tribal Gov't, 522 U.S. at 527 (citing DeCoteau v. District County Court for Tenth Judicial Dist., 420 U.S. 425, 427 n.2 (1975)). Thus, unlike typical political boundaries, the jurisdictional boundaries of Indian tribes are not always clearly delineated, and often are determined through adjudication or other administrative proceedings. See, e.g., id. at 534; Tribal Authority Rule, 40 C.F.R. pt. 49, 63 Fed. Reg. 7254 (Feb. 12, 1998).
 
 
 7
 "[T]he test for determining whether land is Indian country does not turn upon whether that land is denominated 'trust land' or 'reservation.' Rather, we ask whether the area has been 'validly set apart for the use of the Indians as such, under the superintendence of the Government.' " Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 511 (1991) (quoting United States v. John, 437 U.S. 634, 648-49 (1978)). Difficult jurisdictional questions can arise over lands that do not meet the prima facie test for "Indian country." Claims of superintendence can be controversial for lands that tribes claim to be "dependent Indian communities," where title is not held by the federal government or Indians, e.g. Venetie Tribal Gov't, 522 U.S. at 525-27, or lands outside the exterior boundaries of formally-established reservations such as lands taken into trust for tribes pursuant to the Indian Reorganization Act (25 U.S.C. 465 (2000)), for which no action was taken by treaty, Executive Order, or act of Congress to set the lands aside for the use and benefit of a tribe.
 
 
 8
 It is against this background that EPA adopted its new Part 71 rules providing for federal administration of an operating permits program in Indian country.
 
 C. The 1999 Part 71 Rule
 
 9
 In 1999, EPA finalized its 1997 proposal, 62 Fed. Reg. 13748 (March 21, 1997), establishing the Part 71 federal operating permits plan throughout "Indian country unless a Tribal or State Part 70 program has been explicitly approved for the area." 64 Fed. Reg. at 8247, 8249 (codified at 40 C.F.R. 71.4(b)). The major area of contention between petitioners and EPA, and thus the issue before this Court is EPA's authority to promulgate "Part 71 programs for Indian country." Section 71.4(b) provides:
 
 
 10
 The Administrator will administer and enforce an operating permits program in Indian country as defined in 71.2, when an operating permits program which meets the requirements of part 70 of this chapter has not been explicitly granted full or interim approval by the Administrator for Indian country. For purposes of administering the part 71 program, EPA will treat areas for which EPA believes the Indian country status is in question as Indian country.
 
 
 11
 40 C.F.R. 71.4(b) (emphasis added). Specifically, this Court must evaluate whether EPA's decision to "treat areas for which EPA believes the Indian country status is in question as Indian country" has exceeded the agency's authority under the Clean Air Act.
 
 
 12
 In its 1995 proposal for Part 71, EPA stated that the "Act authorizes EPA to protect air quality on lands over which Indian Tribes have jurisdiction." 60 Fed. Reg. at 20809 (emphasis added). The purpose was to provide a "mechanism by which EPA [could] assume responsibility to issue permits in situations where the State, local, or Tribal agency has not developed, administered, or enforced an acceptable permits program...." Id. at 20805. Thus, under the 1995 proposal, EPA would issue permits for "Tribal areas" that "EPA determines to be within a Tribe's inherent authority." Id. at 20830 (emphasis added). As a prerequisite the 1995 proposal would have "required Tribes to establish their jurisdiction over certain areas of Indian country before EPA could implement a Federal program for those areas." 64 Fed. Reg. at 8249 (emphasis added); see 60 Fed. Reg. at 20809. The 1999 rules adopted in Part 71 and the agency's approach to determining jurisdiction differ sharply from the original 1995 proposal. Unlike the present rule, a final jurisdictional determination would have been required regardless of whether the tribe sought its own program. Moreover, EPA proposed to follow the same "approach to resolving jurisdictional issues taken in the Tribal air rule." 60 Fed. Reg. at 20810. "EPA would notify appropriate governmental entities of the boundary of the Tribal area for a part 71 program at least 90 days prior to the effective date of the program," and where a dispute arose provide notice in the Federal Register and seek comments. Id. Finally, the 1995 proposal anticipated that EPA would "implement a part 71 program that covers all undisputed areas, while withholding action on the portion that addresses areas where a jurisdiction issue has not been satisfactorily resolved." Id. (emphasis added). In contrast, under the adopted rule, EPA assumes jurisdiction if "EPA believes" the status of the area is "in question." 40 C.F.R. 71.4(b); 64 Fed. Reg. at 8262.
 
 
 13
 EPA contends that under its new Part 71 rule it need only conclude there is a "bona fide" question before it will treat an area's Indian country status as "in question." See 64 Fed. Reg. at 8248 n.1. EPA claimed its authority with respect to "in question" lands is based on the agency's "overarching authority to protect air quality within Indian country, not solely on its authority to act in the stead of an Indian Tribe." 62 Fed. Reg. at 13749. Further, rather than determine whether an area's status is Indian country or at least "in question" through notice and comment rulemaking, the agency proposes to use adjudications over individual emitting sources to determine an area's status. See 64 Fed. Reg. at 8255 ("EPA would not conduct area-specific rulemaking procedures to assess the boundaries of programs in Indian country.... Specific 'boundary' questions relating to applicability of the program to particular sources would be addressed through a less formal consultation process [and] EPA would make case-specific determinations on whether particular sources are in Indian country."); id. at 8257. Petitioners sought review in this Court of the portion of EPA's 1999 Part 71 Rule authorizing EPA to treat as "Indian country" lands for which EPA has deemed "Indian country" status to be "in question" and of EPA's determination to make jurisdictional inquiries through case-by-case adjudications rather than notice and comment rulemakings.
 
 II. Analysis
 A. EPA's Authority
 
 14
 It is elementary that our federal government is one of limited and enumerated powers. "The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176 (1803) (Marshall, C.J.). This principle applies with equal force to the so-called modern administrative state. EPA is a federal agency--a creature of statute. It has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). Thus, if there is no statute conferring authority, a federal agency has none. We must reverse EPA's decision to administer a federal operating permit program in lands whose Indian country status is considered to be "in question" if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. EPA, 768 F.2d 385, 389 n.6 (D.C. Cir. 1985), cert. denied, 474 U.S. 1082 (1986). If EPA lacks authority under the Clean Air Act, then its action is plainly contrary to law and cannot stand. See American Petroleum Inst. v. EPA, 52 F.3d 1113, 1119-20 (D.C. Cir. 1995) ("API"); Ethyl Corp. v. EPA, 51 F.3d 1053, 1060 (D.C. Cir. 1995). To determine whether the agency's action is contrary to law, we look first to determine whether Congress has delegated to the agency the legal authority to take the action that is under dispute. United States v. Mead Corp., 121 S. Ct. 2164, 2171 (2000) ("We hold that administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law...."); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44. Mere ambiguity in a statute is not evidence of congressional delegation of authority. See Sea-Land Servs., Inc. v. Dep't of Transp., 137 F.3d 640, 645 (D.C. Cir. 1998) ("[Chevron] deference comes into play of course, only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency.") (emphasis added); City of Kansas City, Mo. v. Dep't of Housing & Urban Dev., 923 F.2d 188, 192-93 (D.C. Cir. 1991) ("implicit delegation of interpretive authority," as well as ambiguity, are required before Chevron-step-two deference is appropriate); cf. Railway Labor Exec. Ass'n v. Nat'l Mediation Bd., 29 F.3d 655 (D.C. Cir. 1994) (en banc). However, when Congress has explicitly or impliedly left a gap for an agency to fill, there is a delegation of authority to the agency to give meaning to a specific provision of the statute by regulation, "and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary and capricious in substance, or manifestly contrary to the statute." Mead, 121 S. Ct. at 2171.
 
 
 15
 Agency authority may not be lightly presumed. "Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well." Ethyl Corp. 51 F.3d at 1060 (D.C. Cir. 1995).[2] "Thus, we will not presume a delegation of power based solely on the fact that there is not an express withholding of such power." API, 52 F.3d at 1120.
 
 
 16
 We conclude that the plain meaning of 42 U.S.C. 7601(d) and 7661a grants EPA the authority to "promulgate, administer and enforce a [federal operating permit] program" for a state or tribe if, and only if, (1) the state or tribe fails to submit an operating program or (2) the operating program is disapproved by EPA or (3) EPA determines the state or tribe is not adequately administering and enforcing a program. See 42 U.S.C. §§ 7661a(d), (i). Since Congress has not delegated authority to the agency to act beyond these statutory parameters, we will not defer to EPA's interpretation of the Act as giving it the broader power to indefinitely run a federal operating permit program in the absence of the conditions set out by sections 7661a(d), (i), and 7601(d). See Mead, 121 S. Ct. at 2177 (Chevron deference not applicable "where statutory circumstances indicate no intent to delegate general authority to make rules with force of law"); Chevron, 467 U.S. at 842-43.
 
 B. EPA's Treatment of "In Question" Lands
 
 17
 Petitioners and EPA agree that under the regime Congress has created in the Clean Air Act, the states have primary responsibility for ensuring that ambient air meets federally established standards. Section 502 of the Act, 42 U.S.C. 7661a, addresses EPA approval of state programs. EPA must establish minimum elements of a permit program and each state must develop such a program. Id. at §§ 7661a(b) and (d). Section 502(d)(3) specifies that "[i]f a program meeting the requirements of this subchapter has not been approved in whole for any State, the Administrator shall, 2 years after the date required for submission of such a program ... promulgate, administer, and enforce a program under this subchapter for that State." 42 U.S.C. 7661a(d)(3) (emphasis added). Similarly, if EPA determines that a state (or tribe) is "not adequately administering and enforcing a program, or portion thereof" then "unless the State has corrected such deficiency within 18 months after the date of such finding, the Administrator shall, 2 years after the date of such finding, promulgate, administer, and enforce a program under this subchapter for that State." 42 U.S.C. §§ 7661a(i)(1), (4) (emphasis added).
 
 
 18
 Section 502, 42 U.S.C. 7661a, does not speak of underlying, residual, or even default EPA jurisdiction, authority, or power. It only speaks of the EPA running an implementation program for a state that fails to develop an approved program. EPA has no authority or jurisdiction under section 502 to operate a federal program unless or until the state fails to have a SOP approved within a specified time frame. Further, if EPA does implement a program, the Administrator is instructed only "to administer and enforce federally issued permits under this subchapter until they are replaced by a permit issued by a permitting program," and EPA must "suspend the issuance of permits promptly upon publication of notice of approval of a permit program under this section...." 42 U.S.C. 7661a(e). Thus, once a state program is approved, EPA's authority to operate a federal program under section 502(d)(3) lapses.
 
 
 19
 Nothing in CAA section 301(d), 42 U.S.C. 7601(d), adds to EPA's jurisdiction to implement a federal program in place of the states. Section 301(d) permits the EPA to "treat Indian tribes as States" if certain prerequisites are met, including that the "functions to be exercised by the Indian
 
 
 20
 tribe pertain to the management and protection of air resources within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction." 42 U.S.C. 7601(d)(2)(B) (emphasis added). If the EPA determines that treatment of Indian tribes as identical to states is inappropriate or administratively infeasible, then the EPA "will directly administer such provisions so as to achieve the appropriate purpose." 42 U.S.C. 7601(d)(4). Thus, under section 301, EPA may treat qualifying tribes as states, and if the tribe fails to meet the requirements set out under section 502, then EPA must implement a federal program. Alternatively, if the tribe fails to qualify, then EPA must likewise implement a federal program. Again, there is no suggestion of inherent or underlying EPA authority, but rather a role for the EPA if the tribe, for whatever reason, does not promulgate a tribal implementation program.
 
 
 21
 It is significant that neither the EPA nor the Intervenor, Navajo Nation, can cite a single reference in the Clean Air Act that suggests that the agency has some overarching jurisdiction to implement federal programs. If anything, the "structure" and "history" of the Act, to which they appeal, suggest otherwise, for it is an experiment in cooperative federalism, as Intervenor notes. Certainly the Act intended to create an overarching federal role in air pollution control policy, as Intervenor argues, but that overarching role is in setting standards, not in implementation. EPA's role for implementation is limited to the conditions set out in 42 U.S.C. §§ 7601(d), 7661a.
 
 
 22
 The Intervenor's brief is telling. To support its contention of default federal jurisdiction it cites vague statements that the Act is "national in scope," that it is to "protect and enhance the quality of the Nation's air resources" or that EPA has the authority to issue regulations necessary to implement the Act. But none of these implies that EPA has some default authority to operate an implementation plan except as specified in sections 301(d) and 502 of the Clean Air Act, 42 U.S.C. §§ 7601(d), 7661a. In its brief, EPA claims that it "always has nationwide enforcement authority under the Act" because "Congress charged EPA not only with generally administering the Act, but also with nationally overseeing and enforcing its requirements." Similarly, in adopting the new Part 71 rules, EPA claimed its "authority under the CAA is based in part on the general purpose of the CAA." 64 Fed. Reg. at 8251. However, "EPA cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area." API, 52 F.3d at 1119. Rather, we have before had occasion to remind EPA that its mission is not a roving commission to achieve pure air or any other laudable goal. See, e.g., API, 52 F.3d at 1119; Ethyl Corp., 51 F.3d at 1058. Commendable though these goals may be, they are not within EPA's portfolio unless the states and tribes fail to implement a program, and the conditions in 42 U.S.C. §§ 7601(d) and 7661a are therefore met.
 
 
 23
 Having determined that EPA's only authority to administer a federal operating permit program is found in 42 U.S.C. §§ 7601(d) and 7661a, we must next determine whether EPA is acting within that authority in the challenged procedure. The answer is plainly no. EPA asserts that where a state has applied to operate a SOP under 42 U.S.C. 7661a, EPA need not actually determine whether the state has jurisdiction. Rather, EPA claims it may administer a federal operating permit program for sources in Indian country, including areas where EPA believes a bona fide question of Indian country status exists. Much of EPA's brief is dedicated to arguing that it has authority to administer a federal operating permit program in Indian country. However, these words are wasted as petitioners do not claim otherwise. At issue in this case is EPA's authority to administer a federal program where the Indian country status is merely in question. The petitioner states do not contend, as EPA and Intervenor suggest, that the states should have jurisdiction over Indian country lands. Petitioners happily concede that tribes, and thus, potentially the EPA--acting for the tribe--have jurisdiction over Indian country. Similarly, petitioners not only concede that EPA may undertake initial jurisdictional linedrawing, subject to judicial review, they insist, correctly, that EPA must make jurisdictional determinations. That is, EPA cannot acquire jurisdiction for itself merely by determining that an area's status is in question. Were we to hold otherwise, EPA would effectively have a blank check to expand its own jurisdiction by not deciding jurisdictional questions. The Clean Air Act does not confer such authority.
 
 
 24
 EPA argues that it is the state's burden under 42 U.S.C. 7661a(d)(1) to make a showing of "adequate authority" (and thus state jurisdiction) to carry out a SOP, and that unless a state can demonstrate authority to regulate an area, then EPA must provide for effective implementation of Title V programs. EPA contends it need not determine whether the disputed area is within the jurisdiction of a state or a tribe, and that by operating a federal program over "in question" areas it avoids jurisdictional disputes. See 64 Fed. Reg. at 8254. Because Congress has given EPA discretion to determine how to preserve tribes' statutorily-granted options to seek to run a Title V program for sources within Indian country, EPA argues that this Court should defer to its decision under Chevron step two, as a rule reasonably filling the gap left by Congress.
 
 
 25
 What EPA fails to appreciate is that its actions create a jurisdictional dispute. If a state has an approved implementation plan, then EPA's only grounds for jurisdiction under the Act is the fact that an area is Indian country, not that its status is "in question." If the state does not have an approved plan, then EPA is acting for the state. There are no intermediate grounds on which EPA may indefinitely exercise jurisdiction--it is either acting in the shoes of a tribe or the shoes of the state. There is no residual authority granted by the CAA for the EPA to refuse to make a jurisdictional determination and operate a federal program under some general authority of its own. EPA comes close to arguing that because Congress has not expressly forbidden this assertion of federal jurisdiction, the agency may assert it. However, as we reminded the EPA in Ethyl Corp. and American Petroleum Institute, to suggest "that Chevron step two is implicated any time a statute does not expressly negate the existence of a claimed administrative power ..., is both flatly unfaithful to the principles of administrative law ... and refuted by precedent." 51 F.3d at 1060; 52 F.3d at 1120.
 
 
 26
 EPA and Intervenor Navajo Nation also argue that EPA's obligation to protect Indian interests in land, including jurisdiction and other facets of self-government, and the strong federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian lands, support the 1999 Part 71 rule allowing EPA to operate a federal program for lands in question. See Exec. Order No. 13175, 3(a), 65 Fed. Reg. 67249 (Nov. 9, 2000) ("Agencies shall respect Indian tribal self-government and sovereignty, honor tribal treaty and other rights, and strive to meet the responsibilities that arise from the unique legal relationship between the Federal Government and Indian tribal governments."). Intervenor argues that to allow states to implement Title V programs where the Indian country status is "in question" would infringe on rights that belong to the tribes under both the CAA and "general principles" of federal Indian law. EPA similarly asserts that by operating a federal program for "in question" areas, it "protect[s] tribal sovereignty interests." EPA essentially argues that its interpretation of the CAA is correct because it favors Indian interests. Yet, the bedrock canon of statutory interpretation in American Indian jurisprudence that " 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit' " is simply not implicated here. Cobell v. Norton, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985)). EPA is not interpreting 42 U.S.C. §§ 7601(d) and 7661a for the benefit of Indian tribes. It does not, for example, propose to give Indian tribes jurisdiction over "in question" lands. Rather it is refusing to make a jurisdictional determination, thereby depriving both tribes and states of the opportunity afforded them by Title V to operate a permitting program. If anything, by claiming independent federal jurisdiction over "in question" areas, EPA is construing these statutes for its own benefit.
 
 
 27
 EPA notes in its brief that "disputes" over whether a particular parcel of land is Indian country "typically are resolved by tribunals other than EPA." However, EPA offers no reason why it should refrain from deciding such jurisdictional questions when they arise under the CAA. Quite to the contrary, EPA has willingly accepted that it must make jurisdictional decisions before approving a tribal implementation plan. That very issue was the topic of litigation before this Court just last year in Arizona Public Service Co. v. EPA, 211 F.3d 1280 (D.C. Cir. 2000). EPA is not seriously contending that it cannot or should not make jurisdictional decisions. Rather it is suggesting it would prefer just to run the program itself. Ironically in the Tribal Authority Rule at issue in Arizona Public Service Co., EPA stated that a "territorial approach to air quality regulation best advances rational, sound air quality management," 59 Fed. Reg. 43956, 43959 (Aug. 25, 1994), yet here EPA does not want to decide who controls the territory, instead leaving pockets of "in question" lands under federal, not Indian, jurisdiction.
 
 
 28
 EPA claims in its brief that it will only assert authority if there is a "bona fide" question of an area's status. However, in the Federal Register, EPA concluded that for the "purposes of this rule, there may be, but need not be, a formal dispute, such as active litigation or other form of public disagreement, for EPA to consider the Indian country status of the area to be in question." 64 Fed. Reg. at 8254. Thus, at least in the Federal Register, EPA has set a low, indeed virtually undefined, threshold for deciding there is a dispute. In any event, the Clean Air Act does not provide for EPA to administer a federal program even if there is a bona fide question of the area's status. Instead, under 42 U.S.C. 7661a(d), EPA must determine whether the state has adequate authority to carry out the SOP. And EPA must tell the state if the SOP is disapproved because of a lack of jurisdiction. Section 7661a(d)(1) requires that if the SOP is disapproved, "in whole or in part, the Administrator shall notify the Governor of any revisions or modifications necessary to obtain approval." As petitioners point out, there either is jurisdiction or there isn't, but either way EPA must decide and not simply grab jurisdiction for itself on the ground that an area is "in question." Jurisdiction as between states and tribes is binary, it must either lie with the state or with the tribe--one or the other--and EPA does not have a third option of not deciding.
 
 
 29
 Petitioners correctly fear that EPA is creating a situation in which it may assume jurisdiction for itself and perpetually keep it from the states (or the tribes) because of a lack of showing of jurisdiction, without ever deciding who has jurisdiction. EPA even anticipates such an eventuality. It notes:
 
 
 30
 Where a State and Tribe assert jurisdiction over an area whose Indian country status EPA believes is in question (and EPA has not resolved the question and has not explicitly approved a part 70 program as applying in the area), EPA would not view either the State or the Tribe as having satisfied the CAA section 502(b)(5) requirements to have adequate authority.... Only when the State or Tribe prevails on the Indian country question would EPA then be able to conclude that the section 502(b)(5) requirements have been met for the area. Until that time, the absence of an approved part 70 program in the area necessitates implementation of part 71. By federally implementing the title V program in areas for which EPA believes the Indian country status is in question, EPA can help avoid jurisdictional disputes that might hinder effective implementation of the CAA.
 
 
 31
 64 Fed. Reg. at 8254 (emphasis added). Instead, EPA declines to resolve the dispute and imposes its own program. This situation arises in part because "EPA believes there is no reason to impose on Tribes the burden of making a jurisdictional showing prior to EPA administering a Federal program." 62 Fed. Reg. at 13750. The source of EPA's belief is not entirely clear. EPA purports to rely on HRI, Inc. v. EPA, 198 F.3d 1224 (10th Cir. 2000). However, the issues in that case were quite different from those confronting us today. In HRI, Inc., the court was called upon to determine whether (1) the EPA had properly determined that a parcel of land was Indian country and (2) whether the EPA had determined that another parcel of land was in dispute. The Tenth Circuit affirmed the EPA decisions before it, but remanded for the EPA to make the jurisdictional determination concerning the disputed land. That court certainly did not determine that the EPA had acquired potentially permanent jurisdiction over a parcel of land simply by reason of its status being in dispute. Here we need not decide whether EPA could temporarily operate a Part 71 federal program while determining whether a state or a tribe has jurisdiction, as that is not before us. EPA does not propose to impose federal jurisdiction over "in question" lands only until it can resolve the dispute, but in perpetuity, or at least until a tribe or state makes an adequate showing through some other regulatory or adjudicatory mechanism. EPA did announce it would work with states, tribes, the Department of the Interior and other stakeholders "to assess whether sources are located in Indian country," which EPA defines as including areas for which EPA believes the Indian country is in question. 64 Fed. Reg. at 8256. But that means only EPA will take questions and comments on whether something is "in question." EPA does not promise--or even suggest--it will determine jurisdiction. It proposes to run a federal program so long as the area is "in question" without resolving that question--and EPA lacks that statutory authority to do so. Even if Congress intended for EPA to fill jurisdictional gaps, it did not empower EPA to create permanent, or even semipermanent, ones.
 
 
 32
 Because EPA's only authority under the Clean Air Act to operate a federal permitting program arises from 42 U.S.C. §§ 7601(d) and 7661a, and because these provisions require that EPA make a determination as to whether a state or a tribe has jurisdiction, we vacate the portion of EPA's 1999 Part 71 rule authorizing EPA to treat lands for which EPA has deemed "Indian country" status to be "in question" as "Indian country" for purposes of implementing a federal program in those areas.
 
 
 33
 C. Procedure for Determining "Indian country" Status
 
 
 34
 In evaluating EPA's decision to use adjudication to resolve jurisdictional questions on a case by case basis, we are guided by SEC v. Chenery, 332 U.S. 194 (1947). When Congress has not specified an approach for the agency to follow, the form of rulemaking or adjudicative procedure "lies primarily in the informed discretion of the administrative agency." 332 U.S. at 203; see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.") (quotations omitted). Thus, EPA's procedures for determining whether a particular emitting source (and thus a particular area) falls within Indian country (or is "in question") would typically be entitled to deference, as the agency has broad discretion to choose between rulemaking and adjudication. See Chenery, 332 U.S. at 203; Vermont Yankee, 435 U.S. at 543. However, when Congress has spoken, we are bound by that pronouncement. Chevron, 467 U.S. at 842-43 (Chevron's step one). Further, regardless of the reasonableness of EPA's decision under Chenery or Chevron step two, under the Administrative Procedure Act ("APA") this Court must determine whether the EPA's decisionmaking process was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. 706(2)(A). Here, Congress has clearly spoken, and under Chevron step one, the inquiry ends there.
 
 
 35
 Section 502(d) of the Act, 42 U.S.C. 7661a(d), requires each state to develop a state program to submit to the EPA. Each state must submit a legal opinion from the attorney general (or environmental agency's chief legal officer) "that the laws of the State, locality, or the interstate compact provide adequate authority to carry out the program." 42 U.S.C. 7661a(d)(1) (emphasis added). It is this provision which has been interpreted to require a showing of jurisdiction. Then, "[n]ot later than 1 year after receiving a program, and after notice and opportunity for public comment, the Administrator shall approve or disapprove such program, in whole or in part." Id. (emphasis added). The Act clearly requires notice and comment in approving or disapproving any part of a state program. That includes the showing of adequate authority and thus jurisdiction. EPA must determine, as part of that proceeding, which must include notice and comment, whether the state has jurisdiction. It follows that if the state has jurisdiction, then the tribe does not, and vice versa. Such proceedings are open to public comment, and judicial review, thus protecting the interests of the tribes as well as the states. Congress has explicitly required use of notice and comment in determining adequate authority (and jurisdiction) when the agency is evaluating the SOPs, and therefore EPA's decision to use separate adjudicatory proceedings that do not include notice and comment is contrary to law and does not survive either Chevron step one or APA review.
 
 
 36
 Section 502(i), 42 U.S.C. 7661a(i), further confirms Congress's clear pronouncement. Under that provision, "[w]henever the Administrator makes a determination that a permitting authority is not adequately administering and enforcing a program, or portion thereof, in accordance with the requirements of this subchapter, the Administrator shall provide notice to the State...." 42 U.S.C. 7661a(i)(1). If the agency believes the state lacks jurisdiction, it must provide notice to the state and give the state 18 months to correct the "deficiency." See id. at 7661a(i)(4).
 
 
 37
 Thus, it is clear under 42 U.S.C. 7661a that jurisdictional determinations are to be made as part of approving or disapproving a state's (or tribe's) operating permit program, and with procedures that include "notice and opportunity for public comment." 42 U.S.C. 7661a(d)(1). The statute here is neither silent nor ambiguous; it requires the use of notice and comment proceedings in the context where questions of jurisdiction are to be resolved. As petitioners concede, such proceedings will likely be complex and difficult. Nonetheless, they are mandated by Congress. That ends our inquiry.
 
 III. Conclusion
 
 38
 EPA must make jurisdictional determinations under the Clean Air Act. It cannot simply declare a jurisdictional conflict and then implement a federal program in the absence of clear state or tribal authority. Congress specifically delineated a role for EPA and a role for states and tribes in the Clean Air Act. Under the Act's plain language, EPA's authority to implement a federal operating permits program is premised on the failure of a state or tribe to implement its own program, not some overarching national authority. See 42 U.S.C. §§ 7601(d), 7661a. Where a valid state program exists, EPA may implement a federal program only for Indian country itself, not for lands the status of which EPA deems "in question." Thus, prior to implementing any federal operating permits program EPA must determine the scope of state and tribal jurisdiction.
 
 
 39
 In making such determinations EPA must use notice and comment proceedings. The Act specifically provides for "notice and opportunity for public comment" in approving or disapproving a state plan, in whole or in part, and it requires "notice to the State" whenever the "Administrator makes a determination that a permitting authority is not adequately administering and enforcing a program, or portion thereof." 42 U.S.C. §§ 7661a(d)(1), (i)(1). This includes determinations of "adequate authority," and thus determinations of jurisdiction under the Act. Id. at 7661a(d)(1). Because Congress's intent is clear, EPA's proposed approach is simply contrary to law.
 
 
 40
 We grant the petition for review, vacate the portion of the 1999 Part 71 rules authorizing EPA to treat lands for which EPA has deemed "Indian country" status to be "in question" as "Indian country," and remand to the agency for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The following petitions for review challenging the same EPA rule were consolidated and are before us: State of Michigan, Michigan Dep't of Envtl. Quality v. EPA, No. 99-1151, American Forest and Paper Ass'n, Inc. v. EPA, No. 99-1152, New Mexico Oil & Gas Ass'n v. EPA, No. 99-1153, New Mexico Env't Dep't v. EPA, No. 99-1154, and Public Serv. Co. of New Mexico and Salt River Project Agric. Improvement and Power Dist. v. EPA, No. 99-1155. Arizona Public Serv. Co. v. EPA, No. 99-1146, challenging the same rule, was voluntarily dismissed without prejudice on September 14, 2000.
 
 
 [2]
 Such a result would be out of keeping with Mead as well.