**ALLIANT ENERGY CORPORATION, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Enron Power Marketing, Inc., et al., Intervenors.**

**Enron Power Marketing, Inc., Petitioner,**

v.

**Federal Energy Regulatory Commission, Respondent.**

MidAmerican Energy Company,
et al., Intervenors.

Nos. 99–1448, 99–1544.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 6, 2001.

Decided June 19, 2001.

Steven J. Ross argued the cause for the MAPP Members as petitioners in No. 99–1448 and as intervenors in No. 99–1544. Catherine M. Giovannoni and Richard T. Saas were on brief.

Jeffrey D. Watkiss argued the cause for Enron Power Marketing, Inc. as petitioner in No. 99–1544 and as intervenor in No. 99–1448. Ronald N. Carroll was on brief.

David H. Coffman, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. Dennis Lane, Solicitor, Federal Energy Regulatory Commission, was on brief.

Donna M. Attanasio argued the cause for intervenors Northern States Power Company and Northern States Power Company (Wisconsin) in No. 99–1448. Earle H. O'Donnell was on brief.

Isaac D. Benkin was on the brief of intervenor Nebraska Public Power District in No. 99–1448.

Before: WILLIAMS, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The petitioners challenge two decisions of the Federal Energy Regulatory Commission (Commission or FERC) that ordered the Mid–Continent Area Power Pool (MAPP) to refund "third party compensation" charges it assessed customers after March 1, 1997 for transmitting electricity into or outside of the MAPP geographical area. First, a group of petitioning MAPP members (MAPP petitioners) assert that the ordered refunds are impermissibly retroactive and that they were incorrectly calculated. In addition, petitioner Enron, a MAPP member and beneficiary of the refunds, maintains the refunds should include not only the third party compensation charges, as the Commission directed, but also a portion of the amounts Enron paid MAPP border utilities, based on their tariff rates, to transmit the energy inside or outside the MAPP area. For the reasons set forth below, we reject all of the petitioners' arguments and deny both petitions for review.

## I.

MAPP is an association of energy transmission utilities, generators and marketers serving an area encompassing part or all of several midwestern and western states and two Canadian provinces. Among other functions, MAPP coordinates energy sales and transmissions between and among its members. Before 1994 MAPP's energy pooling agreement required its members to provide free, reciprocal transmission service to other members. In 1994 the pooling agreement was amended with the addition of a tariff, "Schedule F," that imposed a charge for transmissions among MAPP members, but at a discounted distance-based rate rather than at the individual transmitting members' filed tariff rates. FERC accepted the new agreement, including Schedule F, in a decision dated December 15, 1994. *Mid–Continent Area Power Pool*, 69 F.E.R.C. ¶ 61,347, 1994 WL 701296 (1994). The Commission provided the following explanation for its decision to accept the new schedule:

> Notwithstanding our concerns with the calculations and adjustments discussed above, we will accept the proposed MAPP rates for filing because MAPP's methodology produces rates that are just and reasonable and not unduly discriminatory or preferential when tested against traditional standards. We note that the single system-wide MAPP rate that members will pay for service over the entire MAPP system is lower than the rate that each jurisdictional MAPP member could separately propose under a traditional rate while taking into account distance and power flows.

*Id.* at 62,307.

In March 1996 MAPP filed a proposed restated pooling agreement that amended Schedule F to include a new section 2.4 requiring that a MAPP member purchasing energy from or selling energy to a nonmember arrange for extra-MAPP trans-

mission with a MAPP border utility (paying the border utility's tariff for the transmission) and, in addition, that the member pay MAPP itself the Schedule F intra-pool transmission charge in order "to compensate Members for third party use of their systems in connection with [the] sales or purchases." Joint Appendix (JA) 56.[1]

On May 16, 1996 the Commission issued "Order 888," a final rule which requires generally that each public utility, and utility pool, file an "open access tariff" by a specific deadline. Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities and Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, Order No. 888, 61 Fed. Reg. 21,-540, 21,541 (1996) (codified at 18 C.F.R. § 35.28). The order required power pools such as MAPP to file both "reformed power pooling agreements" and "a joint pool-wide Final Rule pro forma tariff" not later than December 31, 1996. *Id.* at 31,728. The reformed power pool agreement must

"establish open, non-discriminatory membership provisions and modify any provisions that are unduly discriminatory or preferential." *Id.* The tariffs, like all open access tariffs filed under Order 888, are required to conform both to the "pro forma tariff" set out in the final rule[2] and to FERC's 1994 *Transmission Pricing Policy Statement,* 59 Fed. Reg. 55,031 (1994), *clarified,* 71 F.E.R.C. ¶ 61,195, 1995 WL 308644 (1995) (Policy Statement).[3] *See* Order 888, 61 Fed. Reg. at 21,541, 21,618–19.

On September 12, 1996 the Commission issued a decision accepting the restated MAPP agreement filed the previous March, including Schedule F. *Mid–Continent Area Power Pool,* 76 F.E.R.C. ¶ 61,-261, 1996 WL 518530 (1996). The Commission noted its 1994 order had found that the tariff's methodology, "while flawed, produced rates that were just and reasonable and not unduly discriminatory or preferential when tested against traditional standards" because "the single sys-

---

1. Section 2.4 of the filing provided in full:

    **Additional Use of Rate Schedules:** In addition to the primary purpose of this Tariff, as set forth in Sections 2.1 and 2.2, the Members shall also use the rate schedules appended hereto to compensate Members for third party use of their systems in connection with sales or purchases by Members to or from non-Members that otherwise meet the requirements of a Coordination Transaction. Such transactions must be scheduled and arranged by the transacting parties under the Transmission Providers' Open Access Transmission Tariffs or other transmission agreements.

    JA 56. Section 1.7 of Schedule F defines a "Coordination Transaction" as "[a]ny sale for resale of power and/or energy between Members, for a period not to exceed two years, using existing generation and transmission facilities." JA 48.

2. The pro forma tariff was issued in its final form in "Order 888–A," 62 Fed. Reg. 12,274 (Mar. 14, 1997).

3. The Policy Statement espoused a "new policy . . . designed to allow much greater trans-

mission pricing flexibility than was allowed under previous Commission policies." 59 Fed. Reg. at 55,031. The Commission announced therein that it would "permit more flexibility to utilities to file innovative pricing proposals that meet the traditional revenue requirement and will allow such proposals to become effective 60 days after filing, as long as they satisfy certain pricing principles" and "the Commission determines that such a pricing proposal meets the statutory requirements of the [Federal Power Act], i.e., is just and reasonable and not unduly discriminatory or preferential." *Id.* (footnote omitted). One of the principles that had to be satisfied was the "comparability standard" "for judging whether access to transmission services is unduly discriminatory, or anticompetitive." *Id.* at 55,034. Under that standard, "[a]n open access tariff that is not unduly discriminatory or anticompetitive should offer third parties access on the same or comparable basis, and under the same or comparable terms and conditions, as the transmission provider's uses of its system." *Id.* (footnote omitted; alteration original).

tem-wide MAPP rate that members would pay for service over the entire MAPP system would be lower than the rate that each public utility MAPP member could separately propose under a traditional, postage stamp rate while taking into account distance and power flows." *Id.* at 62,341–42 (citing 69 F.E.R.C. at 62,307). The 1996 restated Schedule F, the Commission concluded, "still produces rates that are reasonable when compared to the rate that each public-utility MAPP member could separately propose using a traditional, postage stamp rate methodology." *Id.* at 62,342. The Commission nevertheless warned MAPP:

> Nothing in this order relieves MAPP public utility members of their obligations under Order No. 888 to file a joint pool-wide pro forma tariff no later than December 31, 1996, and to begin to take service under that tariff for all pool transactions no later than December 31, 1996. They must also file a reformed power pooling agreement no later than December 31, 1996 that establishes open, non-discriminatory membership provisions and modifies any provisions that are unduly discriminatory or preferential. When those filings are made, the Commission will review rate and non-rate issues pertaining to MAPP to ensure that MAPP's public utility members are complying with Order No. 888.

*Id.* at 62,336; *see also id.* at 63,342 (noting that "issue [of special rates] can be renewed when MAPP files its joint poolwide pro forma transmission tariff in response to Order No. 888"); *id.* n. 11 ("Under Order No. 888, public-utility members of loose pools like MAPP must file reformed power pooling agreements no later than December 31, 1996, and a joint pool-wide pro forma transmission tariff no later than December 31, 1996. Therefore, we will soon have another opportunity to review rate issues when the revised MAPP agreement is filed.").

On December 24, 1996 MAPP submitted a "compliance filing," as required by Order 888, which included a substantially unchanged Schedule F. On February 20, 1997 Enron, after being assessed the third party charge for extra-MAPP transmission in accordance with Schedule F, intervened to challenge the MAPP compliance filing as inconsistent with Order 888 and its pro forma tariff. In an order issued February 28, 1997 the Commission declared that MAPP's submissions were "hereby accepted for filing and suspended for a nominal period, to become effective March 1, 1997, subject to refund and subject to the issuance of further orders." 78 F.E.R.C. ¶ 61,203, at 61,883, 1997 WL 276508 (1997).

On March 10, 1997 Enron sent MAPP a letter complaining that imposing the Schedule F charges on top of the border utility's individual tariff rate charge for extra-MAPP transmission was discriminatory. When the parties failed to resolve the dispute internally or through mediation, Enron filed a complaint with the Commission on August 19, 1997 asserting MAPP's filing did not conform to the Order 888 pro forma tariff because it discriminated against extra-MAPP transactions. Enron sought a declaration that MAPP violated Order 888 by failing to file an open access tariff and by assessing the third party charges and requested that the Commission order MAPP to (1) file a conforming nondiscriminatory tariff without third party additive charges and (2) refund to Enron the third party charges it had paid.

In an order issued April 15, 1999 the Commission directed MAPP "to eliminate tariff provisions that are related to member-restricted services," 87 F.E.R.C. ¶ 61,-075, at 61,310, 1999 WL 217072 (1999), and specifically to eliminate section 2.4 which it found "unacceptable," *id.* at 61,313. The Commission also directed MAPP to pro-

vide "refunds for any and all billings under the compliance tariff ... for transactions periods [sic] commencing March 1, 1997, the date that MAPP's compliance tariff became effective." *Id.* at 61,324.

Enron filed a "Request for Clarification or Alternatively Rehearing" of the April 15, 1999 decision, seeking a declaration that the refunds should include not only the third party charges but also the difference between the transmission charges Enron paid (based on the border utilities' tariffs) and what Enron would have paid if charged the discounted member transmission rate. The MAPP petitioners also filed for rehearing, on behalf of MAPP, challenging the Commission's authority to order retroactive refunds and the method of their calculation. In an order issued November 1, 1999 the Commission denied each rehearing petition and clarified that the refunds should be limited to the third party compensation charges.[4]

Both the MAPP petitioners and Enron petitioned the court for review.

## II.

■ First, MAPP asserts the third party compensation charge refund ordered by the Commission constitutes retroactive ratemaking in violation of the Federal Power Act. "The governing principle is that when there is a 'substitution of new law for old law that was reasonably clear,' the new rule may justifiably be given prospectively-only effect in order to 'protect the settled expectations of those who had relied on the preexisting rule.' By contrast, retroactive effect is appropriate for

'new applications of [existing] law, clarifications, and additions.' " *Public Serv. Co. of Colo. v. FERC,* 91 F.3d 1478, 1488 (D.C.Cir.1996) (quoting *Williams Natural Gas Co. v. FERC,* 3 F.3d 1544, 1554 (D.C.Cir.1993)), *cert. denied, Amoco Prod. Co. v. Public Serv. Co. of Colo.,* 520 U.S. 1224, 117 S.Ct. 1723, 137 L.Ed.2d 844 (1997). In this case, the Commission's April 15, 1999 decision rejecting MAPP's compliance filing and ordering refunds was a permissible application of existing law, Order 888, which the Commission had issued on May 16, 1996. MAPP nonetheless contends that, when it submitted its compliance filing on December 24, 1996, it reasonably relied on the Commission's September 12, 1996 decision accepting Schedule F for filing and expressly concluding that its methodology, "while flawed, produced rates that were just and reasonable and not unduly discriminatory or preferential when tested against traditional standards." *See* 76 F.E.R.C. at 62,-341.[5] We conclude MAPP could not reasonably rely on the September 1996 order to establish that Schedule F, and in particular section 2.4, complied with Order 888.

Order 888 was expressly designed "to remedy undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce." 61 Fed. Reg. at 51,541. Under Order 888 every electrical transmitter was required, for the first time, to file an open access tariff that conformed to both the Commission's new pro forma tariff and its 1994 Policy Statement. 61 Fed. Reg. at

---

4. Meanwhile, MAPP filed, and the Commission approved, a revised Schedule F which, *inter alia,* eliminated both the border utility tariff charge and the third party compensation charge and extended the discounted intra-pool rate to extra-pool transmission. *See Mid–Continent Area Power Pool—Order on Compliance Filing,* 88 F.E.R.C. ¶ 61,157 (Aug. 2, 1999).

5. With regard to retroactivity, the MAPP petitioners acknowledge that "[t]he only question before this Court is whether MAPP reasonably relied on the September 1996 Order when it restated its schedule F rates in the Order No. 888 compliance filing." MAPP Reply Brief at 7.

21,541, 21,618–19. Once this new regime took effect and MAPP made its compliance filing, as Order 888 required, it could not reasonably rely on the pre-Order 888 acceptance. *See Public Serv. Co. of Colo. v. FERC*, 91 F.3d 1478, 1490 (D.C.Cir.1996) (reliance on Federal Power Commission treatment of state tax under National Gas Act "would have been foolhardy" because subsequent "enactment of [Natural Gas Policy Act's] substantially new regulatory regime ... undermined any assurance" that such treatment would "withstand scrutiny under the [Natural Gas Policy Act]"). The unreasonableness of MAPP's claimed reliance is particularly apparent when viewed in context. The Commission had expressly warned MAPP in the September 12, 1996 acceptance order that the rates would be reexamined under Order 888 after the compliance filing due in December and repeated this warning when it accepted the December 1996 filing subject to refund on February 28 1997. It should therefore have come as no surprise to MAPP that the Commission subsequently reexamined Schedule F, found the tariff was discriminatory under both Order 888 and its pro forma tariff and ordered refund of overcharges paid after March 1, 1997.[6]

■ The MAPP petitioners next challenge the refund order on the ground that the Commission did not determine the amount charged non-member purchasers and sellers was above that which was "just and reasonable" so as to warrant a refund. They argue that, because the stacked rates of individual members were available as an alternative to Schedule F and were higher than the Schedule F rates charged, the Schedule F rates are necessarily reasonable and no refunds are due. This contention, however, ignores the heart of the matter: the discriminatory effect of *Schedule F*, which the Commission resolved by ordering reimbursement of the offending section 2.5 charge. That an alternative rate exists that is higher than the Schedule F rate is of no consequence.

■ Finally, Enron contends it should have recovered refunds not only of the discriminatory third party charges but also of the difference between each charging border utility's tariff rate and what it would have been charged had the discounted intra-MAPP rate been applied to the extra-MAPP transmission. The Commission, however, provided a simple and reasonable justification for refusing to order a refund of any part of the border members' tariff rates: those rates were never placed at issue in this proceeding. Enron's complaint did not challenge their justness and reasonableness. As a consequence the Commission made no finding they were unjust or unreasonable and they are not a part of the filing that was the subject of the proceeding below but are set out in the individual border members' separately filed tariffs. *See* 87 F.E.R.C. at 61,389.[7]

For the preceding reasons the petitions for review are

*Denied.*

---

6. The brief discussion of section 2.4 in the April 14, 1999 decision expressly cites only the 1994 Policy Statement, 87 F.E.R.C. at 61,323, but other passages in the order make clear that the Commission found MAPP's tariff discriminatory under Order 888 as well, *see* 87 F.E.R.C. at 61,309–10, 61,074–75.

7. The Commission also contends now, with some force, that it lacks authority to order MAPP to refund charges that were collect ed and retained by third parties, namely the charging border members. In light of our holding, however, we need not address this issue and we therefore dismiss as moot MAPP's motion to strike the portion of Enron's reply brief responding to it.