**ATLANTIC CITY ELECTRIC COMPANY, et al.,**
Petitioners,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Duquesne Light Company,
et al., Intervenors.

Nos. 97–1097, 00–1459, 00–1460 & 00–1503.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 5, 2002.

Decided July 12, 2002.

David B. Raskin and Richard L. Roberts argued the cause for PJM Utility petitioners and supporting intervenor. With them on the briefs were Charles G. Cole, David Earl Goroff, Kenneth G. Jaffe, Richard P. Bonnifield, Donald A. Kaplan and Floyd Ligon Norton IV. Arnold H. Quint and Richard T. Saas entered appearances.

Robert H. Solomon, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. Dennis Lane, Solicitor, and Monique Watson, Attorney, were on the brief.

Barry S. Spector argued the cause for intervenors PJM Interconnection, et al. With him on the brief were Arnold B. Podgorsky, Denise C. Goulet, Irwin Popowsky and William F. Fields. Paula M. Carmody entered an appearance.

Before: GINSBURG, Chief Judge, EDWARDS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Nine utility members of the Pennsylvania–New Jersey–Maryland Interconnection (hereinafter "utility petitioners"),[1] petition this Court for review of two final orders issued by the Federal Energy Regulatory Commission ("FERC" or "the Commission"). These orders directed the owners of transmission assets entering into an agreement for an Independent System Operator ("ISO") to give up their right to file changes in tariff rates, terms, and conditions under section 205 of the Federal Power Act ("the Act"), 16 U.S.C. § 824d, and required the owners of transmission assets to modify their ISO agreements to forbid any owner from withdrawing without prior FERC approval pursuant to section 203 of the Act, 16 U.S.C. § 824b. The utility petitioners contend that FERC has exceeded its statutory authority by requiring the owners of transmission assets to cede their statutory right to file rate changes under section 205 of the Act. They also argue that FERC lacks jurisdiction under section 203 of the Act to require Commission approval for withdrawal from an ISO. Finally, petitioner Public Service Electric and Gas Company ("PSE&G")

---

1. The nine petitioners are: Atlantic City Electric Co., Baltimore Gas and Electric Co., Delmarva Power & Light Co., Jersey Central Power & Light Co., Metropolitan Edison Co., Pennsylvania Electric Co., PPL Electric Utilities Corp., Potomac Electric Power Co., and Public Service Electric and Gas Co. Intervenor PECO Energy Company only joins the utility petitioners' section 205 argument.

challenges FERC's order requiring the generic reformation of preexisting wholesale power contracts to reflect transmission pricing concepts available under the new regime as failing to comply with the *Mobile-Sierra* doctrine. Because we agree with the petitioners on all three issues, we grant the petitions for review.

## I. Background

### A. Statutory and Regulatory Framework

Section 201(b) of the Federal Power Act confers upon FERC jurisdiction over all rates, terms, and conditions of electric transmission service provided by public utilities in interstate commerce, as well as over the sale of electric energy at wholesale. 16 U.S.C. § 824(b). Under section 205 of the Act, the Commission is obliged to assure that the rates and charges demanded or received by any public utility in connection with the interstate transmission or sale of electric energy are just and reasonable, and that no public utility's rates will unduly discriminate against any consumers. *Id.* § 824d(a), (b); *see NAACP v. Federal Power Comm'n,* 425 U.S. 662, 669–71, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976). Section 206 of the Act authorizes FERC to investigate, on its own motion or upon complaint, rates and terms of service. *See* 16 U.S.C. § 824e.

"Historically, electric utilities were vertically integrated, owning generation, transmission, and distribution facilities and selling these services as a 'bundled' package to wholesale and retail customers in a limited geographical service area." *Public Utility Dist. No. 1 of Snohomish Co. v. FERC,* 272 F.3d 607, 610 (D.C.Cir. 2001) ("*Snohomish Co.*") (citation omitted); *see New York v. FERC,* — U.S. ——, 122 S.Ct. 1012, 1016–18, 152 L.Ed.2d 47 (2002). However, by 1940, significant economic changes and technological advances made it possible for many new entrants in the generating markets to sell energy at a lower price than many existing generation facilities. *See Snohomish Co.,* 272 F.3d at 610; *New York v. FERC,* 122 S.Ct. at 1017–18. "But barriers to a competitive wholesale power market remained because if and when the existing vertically integrated utilities provided regional transmission access to these new efficient generating plants, they favored their own generation." *Snohomish Co.,* 272 F.3d at 610. Finding that utilities would use their market power to deny transmission access to competing generation sources, FERC issued an order in 1996, relying upon its statutory authority under sections 205 and 206 of the Act, *see* 16 U.S.C. §§ 824d(b), 824e(a), requiring a restructuring of the power industry. That order, Order No. 888, required that the wholesale transmission function be unbundled from the sale of power and required utilities to provide open access to their transmission lines in a nondiscriminatory fashion. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities,* Order No. 888, FERC Stats. & Regs. ¶ 31,036, 61 Fed. Reg. 21,540 (May 10, 1996), *clarified,* 76 F.E.R.C. ¶ 61,009, 1996 WL 363765, and 76 F.E.R.C. ¶ 61,347, 1996 WL 799257 (1996), *on reh'g,* Order No. 888–A, FERC Stats. & Regs. ¶ 31,048, 62 Fed. Reg. 12,274 (Mar. 14, 1997), *clarified,* 79 F.E.R.C. ¶ 61,182 (1997), *on reh'g,* Order No. 888–B, 81 F.E.R.C. ¶ 61,248, 1997 WL 833250, 62 Fed. Reg. 64,688 (1997), *on reh'g,* Order No. 888–C, 82 F.E.R.C. ¶ 61,046, 1998 WL 18148 (1998), *aff'd, Transmission Access Policy Study Group v. FERC,* 225 F.3d 667 (D.C.Cir.2000), *aff'd sub nom. New York v. FERC,* — U.S.——, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) (hereinafter "Order No. 888").

Order No. 888, among other things, set forth the framework for voluntarily creating Independent System Operators ("ISOs"), independent companies that manage transmission facilities owned by utilities. 61 Fed. Reg. at 21,595–97. ISOs have no financial stake in any power market participant, have the ability to halt generation causing transmission system constraints, and must provide real-time transmission information to market participants. *Id.* The Commission emphasized that an ISO's independence with respect to governance and financial interests was fundamental to assuring that an ISO would not favor any class of transmission users. *Id.* at 21,596. Order No. 888 also specifically required tight power pools to file open access tariffs and reformed power pool agreements to establish open, non-discriminatory membership provisions and to modify provisions that were unduly discriminatory or preferential. *Id.* at 21,594. Tight power pools are highly integrated pooling arrangements, involving a central dispatch, where utilities extensively coordinate their planning and operations. FERC stated that power pools could, but were not required to, satisfy Order No. 888's comparability[2] and nondiscrimination requirements by forming a properly constructed ISO. *See id.* at 21,593–94.

## B. The PJM Interconnection

The Pennsylvania–New Jersey–Maryland ("PJM") Interconnection is a tight power pool. *See* Order No. 888, 61 Fed. Reg. at 21,594. The PJM power pool—the oldest and largest power pool in the nation—was formed as a voluntary organization comprised of investor-owned utilities that operate their generating and transmission facilities in a coordinated manner so that regional power loads can be met reliably and efficiently. It was formed in 1927, and became a "tight" power pool by operating as a single control area with freeflowing transmission ties in 1956. Under the 1956 operating agreement, the PJM members agreed to place their generating facilities under the control of a central system dispatcher. The PJM members formed the PJM Interconnection Association in 1993, an unincorporated association which served as the system dispatcher, responsible for administering the PJM service center and control center independent of any individual member of PJM. At no point in the power pool's history did FERC assert jurisdiction over the power pool under section 203 of the Act, which provides in pertinent part: "No public utility shall sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,000, or by any means whatsoever, directly or indirectly, merge or consolidate such facilities or any part thereof with those of any other person, or purchase, acquire, or take any security of any other public utility, without first having secured an order of the Commission authorizing it to do so." 16 U.S.C. § 824b(a).

In response to Order No. 888 the PJM members submitted to FERC in 1996 an open access tariff and several negotiated agreements that proposed to revise the PJM governance structure to put in place an ISO. The utility petitioners filed the tariff and ISO agreement under section

---

**2.** Under the comparability standard, " '[a]n open access tariff that is not unduly discriminatory or anticompetitive should offer third parties access on the same or comparable basis, and under the same or comparable terms and conditions, as the transmission provider's uses of its [own] system.' " *Alliant Energy Corp. v. FERC,* 253 F.3d 748, 751 n. 3 (D.C.Cir.2001) (quoting *Transmission Pricing Policy Statement,* 59 Fed. Reg. 55,031, 55,034 (1994)).

205 and, at the same time, petitioned FERC for a declaratory order disclaiming jurisdiction over the ISO agreement under section 203. The proposal contemplated that the PJM Interconnection Association would be transformed into the PJM ISO, a separate incorporated entity, which would be responsible for administering operational aspects of the transmission network, including dispatching generation to customers. PJM utilities would continue to own and physically operate their transmission facilities, subject to the ISO's directives.

## C. FERC Proceedings

FERC asserted jurisdiction over the PJM restructuring under section 203, ruling that the proposal to transfer operational responsibilities to the ISO is a "disposition of jurisdictional facilities" within the meaning of section 203, requiring FERC authorization. *Atlantic City Elec. Co.*, 76 F.E.R.C. ¶ 61,306, at 62,513, 1996 WL 535440, *reh'g denied as moot*, 77 F.E.R.C. ¶ 61,298, 1996 WL 859366 (1996) ("*Jurisdictional Order*"). FERC claimed authority to require preapproval because "the creation of an ISO requires the transfer of control of the operation of the PJM transmission facilities from the transmission owners, *i.e.*, the public utilities that together comprise PJM, to the ISO" and was thus a disposition under section 203. *Id.* Utility petitioners sought rehearing of this order; however, FERC dismissed the rehearing petition as moot in light of its intervening order rejecting the restructuring proposal on its merits under section 205. *See Atlantic City Elec. Co.*, 77 F.E.R.C. ¶ 61,298, 1996 WL 859366 (1996). The utility petitioners sought review of the *Jurisdictional Order* in this Court, and their petition was held in abeyance pending the conclusion of the administrative proceedings on the PJM restructuring.

In its November 13, 1996 order on the merits, FERC recognized that formulating an acceptable ISO was a difficult task, but found that the restructuring proposal did not conform with the ISO principles set out in Order No. 888. *See Atlantic City Elec. Co.*, 77 F.E.R.C. ¶ 61,148, at 61,559, 1996 WL 659535 (1996). Following the issuance of several orders by FERC providing guidance regarding an acceptable restructuring proposal, the PJM utilities submitted a revised proposal for an ISO on June 6, 1997. The new governance provisions provided for the establishment of an independent ISO consisting of the PJM Office of Interconnection ("PJM–OI") and an independent PJM Board of Managers ("PJM Board"). Under the Operating Agreement, the PJM–OI would administer the day-to-day operations of the PJM power pool, subject to the PJM Board's oversight. The PJM Board would be independent of all industry segments, thus precluding any group or members from asserting undue influence over the operation of the PJM power pool. The ISO would administer certain operational aspects of the transmission network, without assuming physical control over the transmission assets. The PJM utilities would physically operate their transmission facilities subject to the ISO's directives.

The Transmission Owners Agreement provided that the utility owners would offer pool-wide transmission service, and would transfer the administration of the tariff and regional transmission planning and operations to the PJM–OI as the ISO. The Agreement established procedures for changes to rate design and other tariff terms for transmission services. It permitted the transmission owners to file changes in transmission service rate design and non-rate terms and conditions to the tariff under section 205. However, the independent PJM Board could reject a

proposed change by a majority vote "as inconsistent with the creation and operation of a robust, competitive and non-discriminatory electric power market in the PJM Control Area." If the proposal was not rejected by the PJM Board's majority, the PJM–OI would file the proposal with FERC on behalf of the transmission owners pursuant to section 205. If the proposal *were* rejected by the PJM Board, then any PJM party or group of parties could submit alternative proposals to FERC pursuant to section 206 of the Act. Finally, both the Operating Agreement and the Transmission Owners Agreement provided that PJM members had the right to withdraw from the ISO under certain circumstances after giving 90 days notices to the PJM–OI. No provision required parties to seek or obtain FERC approval before withdrawing from the ISO.

FERC found that the revised proposal generally satisfied its ISO principles, and, subject to certain modifications, conditionally approved the ISO structure. *Pennsylvania–New Jersey–Maryland Interconnection*, 81 F.E.R.C. ¶ 61,257, 1997 WL 760259 (1997), *reh'g denied*, 92 F.E.R.C. ¶ 61,282, 2000 WL 1457019 (2000) ("*PJM Restructuring Order*"). The utility petitioners have sought review of two of these modifications and PSE&G has sought review of a third. Specifically, FERC directed petitioners to modify the provision governing changes to rate filings under sections 205 and 206. *Id.* at 62,279. The utilities were required to eliminate a provision allowing them "to unilaterally file to make changes in rate design, terms or conditions of jurisdictional services," except that they could still unilaterally seek a change in the transmission revenue requirements. *Id.* FERC said that all changes in rate design, terms and conditions of service on the utilities' facilities had to be developed and modified "in accordance with the gov-

ernance process" approved in the order. *Id.* Rather than permit unilateral filings by the individual utilities as provided in section 205, FERC found that PJM–OI had the "right and responsibility to participate in the development of any such revisions and to intervene in any proceedings pertaining to such filings." *Id.* Thus as FERC would have it, only the ISO could propose changes in rate design.

FERC also prohibited the withdrawal of utilities from the ISO without preclearance from the Commission. Despite finding that the PJM Board possessed "the requisite independence from the transmission owners," *id.* at 62,263, FERC suggested that members might exercise "implicit" control over the Board by terminating membership. FERC directed the petitioners to modify the restructuring agreements to clarify that "any notice of termination or withdrawal from the agreements must be filed with the Commission and may become effective *only upon the Commission's approval*." *Id.* at 62,265 (emphasis in original). Thus the "90–day withdrawal right is effective *only upon the Commission's approval*." *Id.* at 62,279 (emphasis in original).

Finally, the Commission ordered the transmission owners to modify any agreements under which they provided transmission service to eliminate multiple transmission charges and to reflect that PJM–OI administers those agreements. *Id.* at 62,280–81. Similarly FERC required the modification of any existing bundled wholesale power sales agreements that were inconsistent with the restructured PJM transmission rate arrangements. This modification was to eliminate charges that the utility owners no longer had to pay. *Id.* at 62,281–82. One agreement affected by these requirements is PSE&G's bundled wholesale agreement with the Old Dominion Electric Coopera-

tive ("Old Dominion"). Their agreement, reached in 1992, provided both parties with long-term capacity price stability, by placing strict limitations on the parties' rights to seek changes to the capacity rates. PSE&G challenged FERC's decision and sought rehearing, but the Commission maintained its position. *Pennsylvania–New Jersey–Maryland Interconnection*, 92 F.E.R.C. ¶ 61,282, at 61,962, 2000 WL 1457019 (2000) (order denying rehearing). PSE&G petitioned this Court for review of the *PJM Restructuring Order* as well as the *Compliance Order* implementing the modification to its bundled wholesale power sale agreement with Old Dominion. *Potomac Elec. Power Co.*, 83 F.E.R.C. ¶ 61,162, 1998 WL 307227 (1998), *reh'g denied*, 93 F.E.R.C. ¶ 61,111, 2000 WL 1634751 (2000) ("*Compliance Order*").

The *Jurisdictional Order*, 76 F.E.R.C. ¶ 61,306, 1996 WL 535440 (1996), the *PJM Restructuring Order*, 81 F.E.R.C. ¶ 61,257, 1997 WL 760259 (1997), and the *Compliance Order*, 83 F.E.R.C. ¶ 61,162, 1998 WL 307227 (1998), are thus properly before this Court on petition for review.

## II. Analysis

As a federal agency, FERC is a "creature of statute," having "no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C.Cir.2001) (emphasis added). Thus, if there is no statute conferring authority, FERC has none. *See id.*; *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (recognizing that "an agency literally has no power to act . . . unless and until Congress confers power upon it"). In the absence of statutory authorization for its act, an agency's "action is plainly contrary to law and cannot stand." 268 F.3d at 1081 (citing

*American Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119–20 (D.C.Cir.1995) ("*API*"); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C.Cir.1995)).

"To determine whether the agency's action is contrary to law, we look first to determine whether Congress has delegated to the agency the legal authority to take the action that is under dispute." *Michigan*, 268 F.3d at 1081 (citing *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2000)). Where an administrative agency is relying on a statute committed to its administration for authority, we defer to that agency's interpretation of the statute under the familiar two-step approach of *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead Corp.*, 533 U.S. at 226–27, 121 S.Ct. at 2170–71. Thus, even if an agency possesses delegated authority, if "Congress has directly spoken to the precise question at issue," we "must give effect to the unambiguously expressed intent of Congress," and that ends this Court's inquiry. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (*Chevron* step one). Where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (*Chevron* step two). The agency's interpretation of the statute is entitled to deference only if it is "reasonable and consistent with the statute's purpose." *Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C.Cir.2000). However, "[m]ere ambiguity in a statute is *not* evi-

dence of congressional delegation of authority" in the first instance. *Michigan*, 268 F.3d at 1082 (emphasis added). Rather, *Chevron* "deference comes into play of course, only as a consequence of statutory ambiguity, and then *only* if the reviewing court finds an·implicit.delegation of authority to the agency." *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C.Cir.1998) (emphasis added).

■■ Indeed, "[a]gency authority may not be lightly presumed. 'Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* [, *Mead,*] and quite likely with the Constitution as well.'" *Michigan*, 268 F.3d at 1082 (quoting *Ethyl Corp.*, 51 F.3d at 1060). "'Thus, we will not presume a delegation of power based solely on the fact that there is not an express withholding of such power.'" *Id.* (quoting *API*, 52 F.3d at 1120). Nonetheless, when Congress has explicitly or impliedly left a gap for an agency to fill, there is a delegation of authority to the agency to give meaning to a specific provision of the statute by regulation, "and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary and capricious in substance, or manifestly contrary to the statute." *Mead*, 533 U.S. at 227, 121 S.Ct. at 2171; *see* 5 U.S.C. § 706(2)(A) (agency action shall be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

With this standard in mind, we turn to the case at bar: First we consider whether FERC had authority to require the utility petitioners to give up their statutory rights under section 205 and determine it did not. Second we examine whether section 203 confers authority on FERC to require petitioners to modify the ISO

agreement to allow withdrawal only upon approval by the Commission, and conclude it does not. Finally, we find that FERC's requirement that preexisting wholesale power contracts be modified was contrary to law under the *Mobile-Sierra* doctrine.

### A. Section 205 Rights

■ Section 205 of the Federal Power Act gives a utility the right to file rates and terms for services rendered with its assets. 16 U.S.C. § 824d. The PJM members had voluntarily proposed a sharing arrangement on changes to rate design that attempted to balance the utility owners' rights and the ISO Board's independence. FERC disapproved this sharing arrangement and directed the utility petitioners to give up all authority to make unilateral changes to rate design. Petitioners contend that FERC lacks the authority to require the utility owners to give up their statutory rights under section 205. We agree.

FERC cannot point to any statute giving it authority for its unprecedented decision to require the utility petitioners to cede rights expressly given to them in section 205 of the Federal Power Act. FERC finds no authority in section 205. Indeed, quite the contrary. FERC is attempting to deny the utility petitioners the very statutory rights given to them by Congress. Section 205(d) provides that a public utility may file changes to rates, charges, classification, or service at any time upon 60 days notice. *Id.* § 824d(d). FERC can then review those changes under section 205 and suspend them for a period of five months, but it can reject them only if it finds that the changes proposed by the public utility are not "just and reasonable." *Id.* § 824d(e); *see Cities of Campbell v. FERC*, 770 F.2d 1180, 1184–85 (D.C.Cir.1985); *Papago Tribal Util. Auth. v. FERC*, 723 F.2d 950, 952–53

(D.C.Cir.1983). As the Supreme Court stated in *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division,* 358 U.S. 103, 113–14, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), the public utility, "like the seller of an unregulated commodity, has the right ... to change its rates ... [at] will, unless it has undertaken by contract not to do so." Section 205 (and 206) of the Act "are simply parts of a single statutory scheme under which all rates are *established initially* by the [public utilities], by contract or otherwise, and all rates are subject to being modified by the Commission upon a finding that they are unlawful." *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 341, 76 S.Ct. 373, 100 L.Ed. 373 (1956) (emphasis added) (addressing the provisions of the Natural Gas Act parallel to the Federal Power Act). Thus, FERC plays "an essentially passive and reactive" role under section 205. *City of Winnfield v. FERC,* 744 F.2d 871, 876 (D.C.Cir.1984) (Scalia, J.).

■ Similarly, nothing in section 206 sanctions denying petitioners their right to unilaterally file rate and term changes. Section 206 merely permits the Commission—acting either on its own initiative or after a complaint—to initiate changes to *existing* utility rates and practices. In order to make any change in an existing rate or practice, FERC must first prove that the existing rates or practices are "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a); *see Alabama Power Co. v. FERC,* 993 F.2d 1557, 1569 (D.C.Cir.1993). Then FERC must show that its proposed changes are just and reasonable. *Tennessee Gas Pipeline Co. v. FERC,* 860 F.2d 446, 454 (D.C.Cir.1988). Nothing in this provision gives FERC the power to deny a utility the right to file changes in the first instance.

■ The courts have repeatedly held that FERC has no power to force public utilities to file particular rates unless it first finds the existing filed rates unlawful. *See Pub. Serv. Comm'n v. FERC,* 866 F.2d 487, 488–89 (D.C.Cir.1989) (interpreting parallel provision of the Natural Gas Act, 15 U.S.C. § 717d) ("On four occasions in the last three years this court has reviewed [FERC] efforts to compromise § 5's limits on its power to revise rates. On each the court has repelled [FERC]'s gambit. This is number five."); *Western Res., Inc. v. FERC,* 9 F.3d 1568, 1578 (D.C.Cir.1993) ("We now make it an even six."); *see also Consumers Energy Co. v. FERC,* 226 F.3d 777, 780 (6th Cir.2000) (Natural Gas Act); *Louisiana v. Federal Power Comm'n,* 503 F.2d 844, 861 (5th Cir.1974) (same). Nor may FERC prohibit public utilities from filing changes in the first instance. Rather this Court, among others, has stressed that the power to initiate rate changes rests with the utility and cannot be appropriated by FERC in the absence of a finding that the existing rate was unlawful. Yet here, FERC purports to deny the utility petitioners *any* ability to initiate rate design changes with respect to services provided with their own assets. FERC thereby eliminated the very thing that the statute was designed to protect—the ability of the utility owner to "set the rates it will charge prospective customers, and change them at will," subject to review by the Commission. *City of Cleveland v. FPC,* 525 F.2d 845, 855 (D.C.Cir.1976).

■ Of course, utilities may choose to voluntarily give up, by contract, some of their rate-filing freedom under section 205.

Under the Supreme Court's *Mobile-Sierra* doctrine,[3] parties may negotiate a fixed-rate contract with a provision relinquishing their right to file for a unilateral change in rates. In this case, the parties agreed to a sharing arrangement of the section 205 filing responsibilities. FERC claims that it relied on Order No. 888 and the "bedrock principle" of ISO independence to require the utility petitioners to cede their section 205 rights and mandate a different sharing arrangement. As FERC believes an ISO to be a public utility within the scope of the Federal Power Act, and thus entitled to make section 205 filings, FERC contends that its decision is "entirely reasonable, and is entitled to *Chevron* deference." Yet, FERC's approach would turn *Chevron* on its head. FERC cannot rely on one of its own regulations to trump the plain meaning of a statute. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. While an ISO may have certain section 205 rights, there is simply no denying the utility petitioners' section 205 rights. No matter how "bedrock" the principle of ISO independence may be, Order No. 888 is merely a regulation. It cannot be the basis for denying the petitioners their rights provided by a statute enacted by both houses of Congress and signed into law by the president. While there may be some ambiguity in how to treat an ISO under section 205, such "ambiguity is not evidence of congressional delegation of authority" to set aside the utility petitioners' statutory rights under section 205. *Michigan,* 268 F.3d at 1082. In sum FERC lacks the authority to require the petitioners to cede their right under section 205 of the Act to file changes in rate design with the Commission.

## B. FERC Jurisdiction Under Section 203

■ The utility petitioners argue that FERC erred in directing them to modify their ISO agreements to require Commission approval prior to a utility's withdrawal from the ISO under section 203 of the Act. Section 203 provides: "No public utility shall *sell, lease, or otherwise dispose of*" jurisdictional facilities whose value exceeds $50,000 "without first having secured an order of the Commission authorizing it to do so." 16 U.S.C. § 824b(a) (emphasis added). FERC contends that the formation of the ISO is a "dispos[ition]" of facilities within the meaning of section 203, thus giving the Commission jurisdiction under that section. We disagree. A utility does not "sell, lease, or otherwise dispose" of its facilities when it agrees to the changes in operational control necessary to initially join or to withdraw from an ISO. Therefore FERC exceeded its jurisdiction by directing the utility petitioners to modify their agreement to state that any notice of withdrawal from the ISO shall become effective only upon FERC approval.

■ When the utilities joined the PJM ISO there was no transfer of ownership or even physical operation of their facilities. Pursuant to the operating agreement, each of the utilities retained both ownership and physical control of their facilities, but gave to the PJM ISO certain operational responsibilities relating to the provision of transmission services using their jurisdictional facilities. Thus, when a PJM member withdraws, there is again, no change in ownership, and no grounds for FERC to require preapproval under section 203. FERC contends that the word "dispose" in section 203 can be construed broadly to include the transfer of supervisory opera-

---

**3.** The doctrine derives its name from the companion cases *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), and *Federal Power Comm'n v. Sierra Pac. Power Co.,* 350 U.S. 348, 353, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

tional responsibility over facilities to the ISO. We find such an interpretation to be inconsistent with a logical reading of the statute and an unexplained departure from past FERC practice.

First, the terms "sell" and "lease" in section 203 clearly contemplate a transfer of ownership or proprietary interests. *Id.* The expression "otherwise dispose" requires a similar interpretation under the principle *noscitur a sociis. See Dole v. United Steelworkers of America,* 494 U.S. 26, 36, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) ("words grouped in a list should be given a related meaning"); *Neal v. Clark,* 95 U.S. 704, 708–09, 24 L.Ed. 586 (1877) ("the coupling of words together shows that they are to be understood in the same sense"). Thus, the term "dispose" in section 203 can only reasonably be read to refer to changes or transfers in proprietary interests or something akin thereto.

Second, FERC's expansive reading of its section 203 jurisdiction cannot be reconciled with section 202, which has been definitively interpreted to make clear that Congress intended coordination and interconnection arrangements be left to the "voluntary" action of the utilities. *See* 16 U.S.C. § 824a(a). Section 202 provides that "the Commission is empowered and directed to divide the country into regional districts for the *voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy." *Id.* (emphasis added). That provision does not provide FERC with any substantive powers "to *compel* any particular interconnection or technique of coordination." *Duke Power Co. v. Federal Power Comm'n,* 401 F.2d 930, 943 (D.C.Cir. 1968) (emphasis in original); *see Central Iowa Power Coop. v. FERC,* 606 F.2d 1156, 1167–68 (D.C.Cir.1979) ("Given the expressly voluntary nature of coordination under section 202(a), the Commission could

not have mandated adoption of the [coordination] Agreement"). Thus, it would be anomalous for FERC to have jurisdiction under section 203 to prohibit the utility petitioners from ending their voluntary coordination and interconnection through the PJM ISO. This does not mean that FERC is prohibited from reviewing entry to or exit from an ISO. The petitioners are not disputing FERC's authority to review their agreements at the outset and to decide, based on the evidence in the record, whether the entrance and exit rights specified therein are just and reasonable within the meaning of section 205. Nor do petitioners contest FERC's authority to review a specific withdrawal under section 205. Rather it is only FERC's assertion of jurisdiction under section 203 that is at issue.

Third, prior to this case this Commission held a similar view of the limits of its own jurisdiction under section 203. It observed that "Section 203 was ... designed to insure that *transfers* of utility property to, as well as from, the companies subject to our jurisdiction would be in the public interest." *Duke Power Co.,* 36 F.P.C. 399, 402 (1966) (emphasis added), *rev'd on other grounds, Duke Power Co. v. Federal Power Comm'n,* 401 F.2d 930 (D.C.Cir.1968). Indeed, prior to this case, FERC had *never* applied section 203 where only operational control was transferred. Cases such as *Central Vermont Public Service Corp.,* 39 F.E.R.C. ¶ 61,295, 1987 WL 257899 (1987), and *Savannah Electric & Power Co.,* 42 F.E.R.C. ¶ 61,240, 1988 WL 243907 (1988), cited by FERC, are not helpful to the Commission's position because they involved changes in *corporate ownership* and direct control. *Central Vermont* involved a transfer of ownership and control of jurisdictional facilities through a transfer of common stock from existing shareholders to a newly created holding company. *Savannah Electric* involved the transfer of

all of a public utility's stock to a registered public utility holding company. Indeed these cases note that there was a change in proprietary interest contemplated in the disputed transaction. *See Central Vermont*, 39 F.E.R.C. at 61,960 ("Although the current stockholders of the public utility will own stock in the holding company after the reorganization is completed, they will no longer have a *proprietary interest* in, or direct control over, the jurisdictional facilities") (emphasis added); *Savannah Electric*, 42 F.E.R.C. at 61,778. Similarly the sale/leaseback cases cited by FERC are not relevant because they all involve transfers of proprietary interests through an actual sale of facilities, which are then leased back to the original owner. *See Baltimore Refuse Energy Systems Co.*, 40 F.E.R.C. ¶ 61,366, 1987 WL 118202 (1987). In those cases there was no change in operational control at all—there section 203 approval was required *solely* because of a change in the legal ownership of the facilities. Thus, if these cases show anything, it is that FERC's jurisdiction under section 203 turns on changes in ownership.

■ FERC's supporting intervenors argue that the transfer of operational control over jurisdictional facilities to the ISO is a "disposition" within the meaning of section 203. Similarly, in the *Jurisdictional Order*, FERC noted that "the creation of an ISO requires the transfer of control of the operation of the PJM transmission facilities from the transmission owners ... to the ISO and is a disposition of jurisdictional facilities requiring prior Commission authorization under section 203." 76 F.E.R.C. at 62,513. Yet, FERC did not rely on this analysis in its brief before this Court, and with good reason. In the proceedings below, the Commission found that the PJM power pool was already "operated" on a coordinated basis, with a central dispatch, "by an independent staff referred to as the PJM Office of Interconnection (PJM–OI)." *PJM Restructuring Order*, 81 F.E.R.C. at 62,234 n.1. Prior to the attempt to create an ISO, FERC never asserted section 203 jurisdiction over the PJM tight power pool. The "operational control" exercised by the ISO is no different from that of its predecessor power pool. The distinction suggested by the intervenors, that the PJM utilities are transferring control to an independent ISO rather than a member-controlled tight power pool, is a very thin reed. Moreover, although the ISO would exercise supervision over the daily scheduling and dispatching activities of the network facilities, the participating members would retain *physical control* and ownership of the transmission facilities and be responsible for their maintenance. The transmission owners would merely transmit energy in accordance with the *directives* of the ISO. Public utilities make decisions about the operational control of their facilities on a regular basis. They give customers the right to demand capacity, they enter into coordination agreements, and they join together in cooperative ventures that require common management. Yet, for more than half a century, section 203 has never been construed to give the Commission control over every such agreement. Its focus is plainly upon the *disposition* of the facilities themselves. As "[a]gency authority may not be lightly presumed," *Michigan*, 268 F.3d at 1082, we find that FERC's attempted reach under section 203 exceeds its statutorily defined grasp. No "disposition" within the meaning of section 203 is contemplated by the ISO agreements, and thus FERC has no jurisdiction to require preapproval under that provision.

### C. Generic Modification of Contracts

Finally we turn to PSE&G's challenge to FERC's order requiring the generic reformation of pre-existing wholesale power

contracts to reflect transmission pricing under the new ISO regime. PSE&G contends that the Commission failed to make the particularized findings required under the *Mobile–Sierra* doctrine. FERC concedes that it did make a "generic" finding that existing bilateral and power sale agreements of PJM members had to be modified, but that such a generic finding was entirely appropriate because the PJM restructuring plan "transferr[ed] the obligation to provide open access transmission services from the individual [utility owners] to the ISO." *PJM Restructuring Order,* 81 F.E.R.C. at 62,281. FERC submits that a "decision to proceed generically across a group of contracts that were universally affected in the same way by the restructuring plan was reasonable." Yet petitioner PSE&G had a *Mobile-Sierra* contract that was negotiated at arms length with Old Dominion and designed to provide both parties with long-term price certainty and FERC made no findings that modifications to this contract were required by the public interest. Because the Commission has not made the required findings under the *Mobile–Sierra* doctrine, FERC's order is contrary to law and must be vacated.

Prior to the formation of the PJM ISO, transmission service was (and in most parts of the country, still is) sold on a utility-by-utility basis. If a power sale required transmission service over the lines of more than one utility to travel on a path from the power plant to the buyer, transmission service would be purchased separately from each intervening utility. Under the Commission's ISO guidelines set forth in Order No. 888, the transmission lines of all of the utilities that join an ISO are to be pooled together and sold for a single rate, even when a transaction uses the transmission lines of more than one utility. In Order No. 888 and its progeny, FERC indicated that the new transmission pricing rules were to apply prospectively only. Pre-existing contracts would be left unchanged unless the parties voluntarily agreed to an amendment or the customer proved, on a case-by-case basis, that the facts presented by an individual contract justified a change. *See* Order No. 888, 61 Fed. Reg. at 21,557–58. Yet, in the *PJM Restructuring Order* the Commission ordered that all pre-existing contracts be modified without making any of the required findings under the *Mobile-Sierra* doctrine.

Under the *Mobile-Sierra* doctrine FERC may abrogate or modify freely negotiated private contracts that set firm rates or establish a specific methodology for setting the rates for service, and deny either party the right to unilaterally change those rates, only if required by the public interest. *Texaco Inc. v. FERC,* 148 F.3d 1091, 1095 (D.C.Cir.1998). As we have held, the purpose of the *Mobile-Sierra* doctrine is to preserve the benefits of the parties' bargain as reflected in the contract, assuming that there was no reason to question what transpired at the contract formation stage. *See Town of Norwood v. FERC,* 587 F.2d 1306, 1312 (D.C.Cir.1978). The public interest standard of the *Mobile-Sierra* doctrine is much more restrictive than the just and reasonable standard of section 205 of the Act. *See Potomac Elec. Power Co. v. FERC,* 210 F.3d 403, 407 (D.C.Cir.2000); *Texaco,* 148 F.3d at 1097. Yet, in requiring modifications to the PSE&G–Old Dominion 1992 agreement, FERC failed to undertake, let alone satisfy, the requirements of the *Mobile-Sierra* doctrine. At no time did FERC make a particularized finding that the public interest required the modification of the PSE&G–Old Dominion contract.

FERC claims to have engaged in a fact-specific inquiry in a section 206 complaint brought by Old Dominion. *See Old Dominion Elec. Coop. v. Public Serv. Elec. &*

Gas Co., 84 F.E.R.C. ¶ 61,155, 1998 WL 765464 (1998). However, in that proceeding, the Commission did not engage in *any* analysis; instead, dismissing Old Dominion's complaint, the Commission stated that "we are not persuaded that this docket is the proper place to address the issue of multiple [transmission] charges. Rather, the docket in which this matter should be (and, in fact, already has been) addressed is the *PJM [Restructuring Order]* proceeding." *Id.* at 61,844. Nor is any case-specific justification to be found in the *PJM Restructuring Order.* Instead, FERC simply relied on its general policy to be applied in ISOs that the charging of multiple, utility-specific transmission rates in a transaction that requires use of more than one utility owner's lines should be eliminated. *See PJM Restructuring Order,* 81 F.E.R.C. at 62,281. This is insufficient to satisfy the requirements of the *Mobile-Sierra* doctrine. "[M]ore is required to justify regulatory intervention in a private contract than a simple reference to the policies served by a particular rule." *Texaco,* 148 F.3d at 1097. While FERC may be "becoming hostile to *Mobile-Sierra*" and the particularized findings that doctrine requires, *Boston Edison Co. v. FERC,* 233 F.3d 60, 68 (1st Cir.2000), the Commission would do well to heed its own admonition and "not take contract modification lightly." *Potomac Elec. Power Co. v. Allegheny Power Sys.,* 85 F.E.R.C. ¶ 61,160, at 61,632–33, 1998 WL 758082 (1998), *aff'd, Potomac Elec. Power Co. v. FERC,* 210 F.3d 403 (D.C.Cir.2000).

Despite FERC's bald assertion that the transmission rate under the PSE&G–Old Dominion 1992 agreement was "unreasonable" or "discriminatory," this case involves little more than a party to a contract seeking to avail itself of a lower rate than it was entitled to under the terms of its original agreement. This Court has consistently held, however, that a rate differential attributable to the operation of

the *Mobile–Sierra* doctrine, is not, by itself, enough to demonstrate that the public interest demands a modification to or an abrogation of an existing contract. *See, e.g., Potomac Elec.,* 210 F.3d at 409; *Cities of Bethany v. FERC,* 727 F.2d 1131, 1139–41 (D.C.Cir.1984). As FERC's decision to require the generic reformation of pre-existing wholesale power contracts to reflect transmission pricing under the new ISO regime was based on little else, it fails to comply with the *Mobile-Sierra* doctrine, and is hereby vacated.

## III. Conclusion

FERC has attempted to exert authority where it has none. FERC can point to no statute authorizing its requirement that the utility petitioners cede their statutory rights under section 205 of the Federal Power Act to file changes in rate design with the Commission. Nor does FERC have jurisdiction under section 203 of the Act to require the utility petitioners to modify the ISO agreement to allow withdrawal only upon approval by the Commission. A utility does not "sell, lease, or otherwise dispose" of facilities when it agrees to the changes in operational control necessary to withdraw from (or initially join) an ISO. Finally, FERC's requirement of generic reformation of pre-existing wholesale power contracts, without making a particularized finding that the public interest requires modification of a particular agreement, is a violation of the *Mobile-Sierra* doctrine. Therefore, we grant the petitions for review, vacate those portions of the *Jurisdictional Order, PJM Restructuring Order,* and the *Compliance Order* that are inconsistent with this opinion, and remand for further proceedings.

*So ordered.*