# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 14, 2008      Decided March 28, 2008

No. 06-1403

MAINE PUBLIC UTILITIES COMMISSION
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CONNECTICUT DEPARTMENT OF PUBLIC UTILITY CONTROL, ET
AL.,
INTERVENORS

———

Consolidated with
06-1427, 07-1193

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Lisa Fink*, Attorney, Maine Public Utilities Commission, and *John S. Wright*, Assistant Attorney General, Attorney General's Office of State of Connecticut, argued the cause for petitioners. With them on the briefs were *Lisa S. Gast*, *L. Elise*

*Dieterich*, *Richard Blumenthal*, Attorney General, Attorney General's Office of State of Connecticut, *Michael C. Wertheimer*, Assistant Attorney General, *Martha Coakley*, Attorney General, Attorney General's Office for the Commonwealth of Massachusetts, and *Jesse S. Reyes*, Assistant Attorney General.

*Donald J. Sipe*, *Mary E. Grover*, *Stephen L. Teichler*, *Robert A. Weishaar, Jr.*, and *Vasiliki Karandrikas* were on the briefs for intervenors in support of petitioners. *Jonathan G. Mermin* and *Linda S. Lockhart* entered appearances.

*Jeffery S. Dennis*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor.

*John N. Estes, III* argued the cause for intervenors FPL Energy, LLC. With him on the brief were *Randall L. Speck*, *Scott Harris Strauss*, *Scott Phillip Myers*, *James Kilburn Mitchell*, *Paul Franklin Wight*, *Larry F. Eisenstat*, *George E. Johnson*, *Christopher C. O'Hara*, *Kenneth L. Wiseman*, *Mark F. Sundback*, *Christopher Rhodes Jones*, *Kenneth Richard Carretta*, *David Talmage Musselman*, and *Aaron James Bullwinkel*. *Jennifer L. Spina* entered an appearance.

*Sherry A. Quirk*, *Robin E. Remis*, and *Kathleen A. Carrigan* were on the brief for intervenor ISO New England Inc. in support of respondent. *Kerim P. May* entered an appearance.

*Barry S. Spector* and *Paul M. Flynn* were on the brief for *amicus curiae* PJM Interconnection, L.L.C. in support of respondent.

Before: ROGERS and GARLAND, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

PER CURIAM: The consolidated petitions for review challenge FERC's approval of a comprehensive settlement that redesigned New England's capacity market. The Maine Public Utilities Commission and the Attorneys General of Connecticut and Massachusetts assert that FERC's approval of the settlement was arbitrary and capricious, contrary to law, and beyond the Commission's jurisdiction. We reject most of these arguments, but we agree with the petitioners that the Commission has unlawfully deprived non-settling parties of their rights under the Federal Power Act.

## I.

In a "capacity" market – as opposed to a wholesale electricity market – "the [transmission provider] compensates the generator for the *option* of buying a specified quantity of power irrespective of whether it ultimately buys the electricity."[1] *Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804, 806 (D.C. Cir. 2007). In order to maintain the reliability of the grid, transmission providers generally purchase more capacity than is necessary to meet their customers' demand for electricity. This ensures that the transmission providers are able to respond adequately to unexpected fluctuations in demand.

For many years, New England's capacity market has been

---

[1] It would have been helpful if the parties had actually defined "capacity" before delving into the intricacies of New England's capacity market. Also, the briefs would have been much easier to read if the parties had used fewer acronyms.

rife with problems. As the Commission explained in 2003, "existing generators needed for reliability are not earning sufficient revenues (and are in fact losing money), and [ ] additional infrastructure is needed soon to avoid violations of reliability criteria." *Devon Power LLC*, 115 FERC ¶ 61,340 at 62,315 (2006). In other words, the supply of capacity was barely sufficient to meet the region's demand.

FERC, the generators, the transmission providers, and the power customers have made several attempts to address these issues. In 2003, a group of generators sought to enter into "Reliability Must-Run" agreements with the New England Independent System Operator ("ISO"), which operates the transmission system in New England.[2] Under a Must-Run agreement, a financially-troubled generator in an area with supply shortages may recover up to its full cost-of-service in order to remain in operation. Those agreements have several important drawbacks. As FERC explained:

> [Must-Run] contracts suppress market-clearing prices, increase uplift payments, and make it difficult for new

---

[2] An ISO is an independent company that has operational control, but not ownership, of the transmission facilities owned by member utilities. ISOs "provide open access to the regional transmission system to all electricity generators at rates established in a single, unbundled, grid-wide tariff . . . ." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1364 (D.C. Cir. 2004) (citation omitted). In 2004, the New England ISO was organized as a Regional Transmission Organization ("RTO"). RTOs are given greater regulatory flexibility by FERC, provided that they (*inter alia*): are regional in scope, have exclusive operational control over all transmission facilities within their control, and have sole authority to approve or deny requests for transmission service. *Id.* at 1365.

generators to profitably enter the market. . . . [E]xpensive generators under [Must-Run] contracts receive greater revenues than new entrants, who would receive lower revenues from the suppressed spot market price. In short, extensive use of [those] contracts undermines efficient market performance.

*Devon Power LLC*, 103 FERC ¶ 61,082 at 61,270 (2003). For these reasons, FERC accepted the Must-Run agreements filed by the New England generators, but only allowed these generators to recover certain maintenance costs, not their full cost-of-service. *Id.* at 61,270-71.

In its orders addressing the Must-Run agreements, the Commission simultaneously directed the ISO to develop a new market mechanism that would include a location requirement. *Id.* at 61,271. In a locational market, prices are set separately for various geographical sub-regions. Thus, prices would be highest in the regions with the most severe capacity shortages, which would encourage new entry.

In response to FERC's directive, the ISO proposed a locational capacity market structure in March 2004. This proposed market mechanism included four sub-regions, each of which would have a monthly auction for capacity. The auctions would be based on an "administratively-determined demand curve" that would establish the price and quantity of capacity that must be procured within each sub-region.[3] *Devon Power*

---

[3] Although the parties refer to this as a "demand curve," that term is misleading. Normally, a "demand curve" is a model of the relationship between prices and consumer preferences in a free market. In contrast, the "demand curve" proposed by the ISO is an entirely

*LLC*, 107 FERC ¶ 61,240 at 62,022 (2004). FERC commended the ISO for adopting a locational pricing mechanism that took account of transmission constraints between different sub-regions within New England. *Id.* at 62,028. However, the demand curve proposed by the ISO was extremely controversial – numerous parties submitted comments and testimony regarding the proper height and slope of the curve. *Id.* at 62,031. FERC set the matter for hearing before an Administrative Law Judge ("ALJ").

In June 2005, the ALJ issued a 177-page order that largely accepted the ISO's proposed demand curve. *Devon Power LLC*, 111 FERC ¶ 63,063 (2005). Several parties filed exceptions to this decision, arguing that the ALJ wrongfully excluded evidence and failed to respond to comments about flaws in the ISO's demand curve. On September 20, 2005, the full Commission held an all-day oral argument on the locational market structure and the proposed demand curve. FERC subsequently established settlement procedures to allow the parties to develop a new market mechanism.

After four months of negotiations involving 115 parties, a settlement was reached. As FERC has repeatedly reminded us, only eight of these parties opposed the final settlement. 115

---

artificial construct that specifies the prices that must be paid for various quantities of capacity. 107 FERC at 62,022; *see also Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1234-35 (D.C. Cir. 2005) (explaining the construction of a similar "demand curve" by the New York ISO). This proposal was intended to make revenues and price movements more stable and predictable. 107 FERC at 62,022. That may or may not have been sound policy, but it more accurately should be termed a "non-demand demand curve" reminiscent of the once regulatory invention, a "non-bank bank."

FERC at 62,306. The key feature of the settlement agreement is the Forward Capacity Market, which would replace the ISO's earlier proposal and eliminate the need for the controversial demand curve. Under the Forward Market, there will be annual auctions for capacity, which will be held three years in advance of when the capacity is needed. *Id.* The settling parties determined that a three-year lead time will "provide for a planning period for new entry and allow potential new capacity to compete in the auctions." *Id.* Each transmission provider will be required to purchase enough capacity to satisfy its "installed capacity requirement," which is the minimum level of capacity that is necessary to maintain reliability on the grid. *Id.* at 62,307. As FERC requested, the Forward Market also includes a locational component – the annual auctions will be held in different "capacity zones" based on transmission constraints between the various sub-regions within New England. *Id.*

The most contentious issue regarding the Forward Market is the set of "transition payments" that will be required from December 1, 2006 until June 1, 2010. As explained above, the Forward Market provides for a three-year lead time in the capacity auctions, in order to allow new entrants to bid in the auctions. However, this leaves a three-year gap between the first auction and the time when the capacity procured in this auction will be provided. The parties addressed this issue by negotiating a series of fixed payments that will be paid to generators during the transition period. 115 FERC at 62,308. The agreement also provides that challenges to the transition payments and the final Forward Market auction clearing prices – regardless of whether the challenge is brought by a settling party, a non-settling party, or the Commission – will be adjudicated under the highly-deferential "public interest" standard rather than the usual "just and reasonable" standard.

*Id.* at 62,332-33.

On June 16, 2006, FERC approved the settlement agreement, finding that "as a package, it presents a just and reasonable outcome for this proceeding consistent with the public interest." *Id.* at 62,304. Most importantly, the Commission determined that the settlement would address the problems that had plagued New England's capacity market:

> The settlement package, including both the [Forward Market] and the interim transition mechanism, resolves the issues raised in this proceeding concerning the under-compensation of capacity resources in New England, and provides the appropriate market structure to ensure that generating resources are appropriately compensated based on their location and contribution to system reliability and provides incentives to attract new infrastructure where needed.

*Id.* at 62,316. FERC conceded that the transition payments were not ideal "as a single market design element," but concluded that they were a "reasonable transitory mechanism that enables the New England region to shift to the [Forward Market]." *Id.* at 62,319. In particular, the Commission determined that the transition payments "fall at the very low end" of the range of demand curves (prices) submitted by Maine and the ISO during the litigation over the ISO's previous market structure proposal. *Id.* at 62,321. FERC also approved the agreement's incorporation of the "public interest" standard of review because use of the more deferential standard in a limited number of circumstances would promote "rate stability." *Id.* at 62,335.

After FERC denied rehearing, the Maine Public Utilities Commission and the Attorneys General of Connecticut and

Massachusetts petitioned for review, arguing that the Commission's approval of the settlement was arbitrary and capricious, contrary to law, and beyond the scope of FERC's jurisdiction.[4] Specifically, petitioners assert that: (1) FERC's acceptance of the transition payments was arbitrary and capricious because the record did not contain sufficient data about generators' costs; (2) FERC unreasonably accepted the transition payments even though the payments did not include a locational pricing mechanism; (3) FERC unlawfully accepted a "*Mobile-Sierra*" provision that imposed the deferential "public interest" standard of review on rate challenges brought by non-settling parties; and (4) FERC lacks jurisdiction to approve the settlement agreement because the Forward Market will effectively force states to acquire a specific level of capacity. For the reasons set forth below, we grant the petition for review with respect to the *Mobile-Sierra* issue, but we deny the petition with respect to the other three issues.

## II.

The petitioners argue that FERC's approval of the settlement's transition payments was arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). To withstand review under that standard, FERC must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"

---

[4] The orders under review are *Devon Power LLC*, 115 FERC ¶ 61,340 (2006); *Devon Power LLC*, 117 FERC ¶ 61,133 (2006); *ISO New England, Inc.*, 117 FERC ¶ 61,132 (2006); and *ISO New England, Inc.*, 119 FERC ¶ 61,044 (2007).

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The Commission's findings of fact, "if supported by substantial evidence," are conclusive. 16 U.S.C. § 825*l*(b). When the record would support more than one outcome, we must uphold FERC's order because "[t]he question we must answer . . . is not whether record evidence supports [the petitioner's desired outcome], but whether it supports FERC's." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003). *See generally NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1162 (D.C. Cir. 1998) ("[I]n reviewing the Commission's approval of a contested settlement, we must determine whether the Commission has supplied a 'reasoned decision' that is supported by 'substantial evidence.'" (quoting 18 C.F.R. § 385.602(h)(1)(I)).

In this case, after considering the merits of the settlement as a whole, FERC examined the record evidence and concluded that the transition payments fell within a "reasonable range of capacity prices." 115 FERC at 62,319. The Commission correctly noted that there is not a single "just and reasonable rate" but rather a zone of rates that are just and reasonable; a just and reasonable rate is one that falls within that zone. *Id.*; *see Montana-Dakota Utils. Co. v. N.W. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951) ("Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high."); *Pac. Gas & Elec. Co. v. FERC*, 306 F.3d 1112, 1116 (D.C. Cir. 2002) ("[T]he court may only set aside a rate that is outside a zone of reasonableness, bounded on one end by investor interest and the other by the public interest against excessive rates."); *cf. In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968)

("[T]his Court has often acknowledged that the Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.'"); *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1084 (D.C. Cir. 2002) ("The burden is on the petitioners to show that the Commission's choices are unreasonable and its chosen line of demarcation is not within a zone of reasonableness as distinct from the question of whether the line drawn by the Commission is precisely right." (internal quotation marks omitted)).

In challenging FERC's decision to approve the transition payments, the petitioners argue that there was no record evidence of existing generators' costs and that without such evidence FERC could not find that the payments fell within a reasonable range of capacity prices. In its early orders in *Devon Power*, however, FERC determined that reliance on individualized cost recovery proceedings was not a policy in the public interest and that, instead, capacity payments should be made to all suppliers with a single market-clearing price. *See, e.g.*, *Devon Power LLC*, 110 FERC ¶ 61,315 at 62,227 (2005). FERC is correct that it need not rely on generators' costs to determine rates. The Supreme Court has disavowed the notion that rates must depend on historical costs and has held that rates may be determined by a variety of formulae. *See, e.g.*, *FPC v. Hope Natural Gas Co*, 320 U.S. 591, 602 (1944) ("[T]he Commission [i]s not bound to the use of any single formula or combination of formulae in determining rates."); *see also Mobil Oil Corp. v. FPC*, 417 U.S. 283, 316 (1974) ("Mobil's argument assumes that there is only one just and reasonable rate possible for each vintage of gas, and that this rate must be based entirely on some concept of cost plus a reasonable rate of return. We rejected this argument in *Permian Basin* and we reject it again

here."); *Am. Pub. Power Ass'n v. FPC*, 522 F.2d 142, 146 (D.C. Cir. 1975) ("Congress carefully eschewed tying 'just and reasonable' rates to any particular method of deriving the rates. Certainly there is nothing in the Federal Power Act specifically endorsing historic test year ratemaking or any other technique of ratemaking. Congress clearly intended to allow the Commission broad discretion in regard to the methodology of testing the reasonableness of rates.").[5]

Of course, FERC cannot pluck rates out of thin air; it must rely on record evidence to establish a reasonable range of rates. But contrary to the petitioners' suggestion, FERC's statement that "the transition payments are reasonable rates for existing generators until the [Forward Market] begins," 115 FERC at 62,321, was not simply an assertion but rather a conclusion based on the Commission's analysis of two pieces of record evidence: (1) projected prices under demand curves introduced by Maine and Vermont load representatives and by ISO-New England at the hearing on the locational installed capacity mechanism, and (2) the estimated cost of entry for a new peaker unit. Only after reviewing this evidence to establish a "zone of

---

[5] The petitioners cite *NSTAR Electric & Gas Corp. v. FERC*, 481 F.3d 794 (D.C. Cir. 2007), for the proposition that FERC cannot approve a rate without reviewing cost data, but this mischaracterizes the holding of that case. In *NSTAR*, FERC approved contracts between ISO-New England and certain generators because those contracts provided compensation to generators at a percentage of fixed or variable costs. We remanded the case because, although FERC's rationale relied on costs, there was no substantial evidence of those costs in the record. The *NSTAR* court specifically recognized, however, that FERC need not always rely on historic cost data. *See id.* at 804 ("Nor, of course, do we mean to suggest that only prices in line with historic accounting costs would qualify as just and reasonable.").

reasonableness" did FERC conclude that the transition payments fell within the zone. *Id.*; *see also* 117 FERC at 61,718 (discussing FERC's reliance on demand curve and cost of new entry evidence in evaluating the transition payments).

In establishing the reasonable range of capacity prices, FERC first reviewed evidence introduced at the hearing on the locational installed capacity mechanism (which was later replaced by the Forward Market). FERC decided to look at projected prices for Maine and Northeastern Massachusetts under both the demand curve proposed by Maine and Vermont load representatives and the demand curve proposed by the ISO. The Commission acknowledged that these were not the only two demand curves proposed at the hearing, but, as it explained more fully in the order on rehearing, it chose to rely on these two curves because they came from two different sectors. Load representatives offered demand curves that projected low prices, while supplier representatives offered demand curves that projected high prices; thus, FERC noted that "[i]f the Commission relied only upon demand curves proposed by parties representing load, the transition payments may have appeared excessive; relying only on demand curves proposed by suppliers would imply that the transition payments were inadequate." 117 FERC at 61,719. FERC accordingly "conclude[d] that relying on proposed demand curves from a single sector would have been unreasonable" and focused on two curves – from two different sectors – that provided a narrow range of price projections. *Id.*; *see also* 115 FERC at 62,319-20. Comparing the transition payments to these demand curve projections, FERC found that the transition payments fell within the range of capacity prices projected by both demand curves. 115 FERC at 62,321.

The petitioners object that FERC improperly relied on the

demand curves as a basis of comparison because FERC did not expressly find them to be just and reasonable. Since it never made that finding, the petitioners insist, FERC could not rely on the demand curves to find that the transition payments were reasonable. It is true that FERC may not use unexamined rates as a basis of comparison. *Cf. Laclede Gas Co. v. FERC*, 997 F.2d 936, 946-47 (D.C. Cir. 1993). But here, FERC examined the record evidence and concluded that these two curves "establishe[d] a reasonable range of capacity prices for comparison." 117 FERC at 61,719; *see also* 115 FERC at 62,319-21. FERC's determination that these curves offered a reasonable range of prices for comparison was further supported both by the fact that FERC had explicitly endorsed the demand curve approach in earlier orders, *see* 110 FERC at 62,221 ("[W]e preliminarily find the use of ICAP regions and an ICAP demand curve as proposed by ISO-NE to be just and reasonable . . . ."); *Devon Power LLC*, 107 FERC ¶ 61,240 at 62,031 (2004) ("We agree with ISO-NE's overarching proposal to use a demand curve, and in particular a downward sloping demand curve, as part of the eventual LICAP mechanism in New England."), and by the fact that the administrative law judge had adopted the ISO's demand curve – which contained higher price projections than the Maine-Vermont curve – after a lengthy proceeding, *Devon Power LLC*, 111 FERC ¶ 63,063 at 65,217 (2005) ("[T]he undersigned finds the ISO's demand curve proposal to be just and reasonable . . . ."); *see* 115 FERC at 62,319 ("[T]he Initial Decision did adopt ISO-NE's proposal . . . ."); *see also id.* at 62,320-21. In light of this evidence, FERC's determination was sufficient. A binding merits decision was not required; indeed, such a requirement would largely vitiate the purpose of a settlement.

The petitioners also object to FERC's reliance on evidence of the estimated cost of new entry to determine a reasonable

range of rates. The petitioners raise two concerns. First, they argue that cost of new entry represents the estimated costs of a new peaker, not those of an existing generator, and that the two may have different capital costs. The Commission determined, however, that new peakers have "capital costs [that] are lower than most, if not all, other plants." 115 FERC at 62,321. Hence, if cost of new entry is used as a reference point, the transition payments "are likely to be significantly lower than a cost-of-service payment for most, if not all, new generators." *Id.*; *see id.* at 62,319 (concluding that "in the first years," the transition "payments are less than the cost of new entry, accurately reflecting market conditions").

Second, the petitioners argue that cost of new entry is an arbitrary reference point for the transition period because, although cost of new entry provides a starting point for the Forward Market auction, the Forward Market does not exist during the transition period. But the fact that cost of new entry is used to kick off the auction does not mean that it is relevant only for that purpose. If anything, the reliance on cost of new entry as a starting point of the Forward Market auction underscores its relevance to appropriate rates: it is used to commence the auction because it approximates reasonable compensation for existing as well as new generators. *See id.* at 62,326. FERC sets rates to ensure both that existing generators are adequately compensated and that prices support new entry when additional capacity is needed. *See, e.g.*, Recording of Oral Arg. at 1:02:34-1:03:01, 1:09:30-1:10:35. As FERC therefore noted, cost of new entry is "a key factor in determining appropriate rates for capacity" and was central to the demand curves under the locational installed capacity market as well as the Forward Market design. 117 FERC at 61,718; *cf. Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1235, 1237-38 (D.C. Cir. 2005) (upholding FERC's approval of a demand

curve that sets prices based on the annualized cost of a new peaker plant); *New York Indep. Sys. Operator, Inc.*, 117 FERC ¶ 61,086 at 61,443 n.7 (2006) ("In a competitive market, prices should reach equilibrium at or near to the levelized net cost of new entry."). We conclude that it was reasonable for the Commission to look to cost of new entry as a basis of comparison in its review of the transition payments.

Finally, the petitioners claim that FERC did not respond meaningfully to their objections to the transition payments. *See PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) ("An agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious." (quoting *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001))). Specifically, the petitioners argue that FERC did not address the argument of the Attorneys General that the transition payments do not reflect market conditions, reliability contributions, or cost-of-service; and they cite testimony by an expert witness that the transition payments are significantly in excess of what is needed to retain existing resources because many generators rely in part on sources of energy other than oil and gas (e.g., nuclear and hydro power). The Commission did, however, respond to these objections, discussing the long-term commitment and enhanced reliability contributions of generators that the transition payment mechanism requires. *See* 115 FERC at 62,322; 117 FERC at 61,720, 61,724. FERC also rejected the petitioners' premise that their expert's testimony was the only relevant evidence about whether the transition payments were reasonable and explained that cost of new entry and the demand curves were relevant evidence. *E.g.*, 117 FERC at 61,718-20. In short, FERC's conclusion that the transition payments fell within a reasonable range of capacity prices was a reasoned

decision supported by substantial evidence.[6]

### III.

Petitioner Maine Public Utilities Commission (Maine PUC) argues that FERC's acceptance of non-locational pricing during the transition period was arbitrary and capricious, attacking FERC's decision on both general and specific grounds.

At a general level, Maine PUC contends that FERC acted arbitrarily in approving non-locational transition payments when FERC had previously insisted that a locational structure was necessary for New England. Maine PUC's claim is that, by approving non-locational transition payments, FERC abandoned the core of the market reform it set out to implement, a mechanism that would "appropriately value capacity resources according to their location." Pet'r Br. 48 (quoting *Devon Power LLC*, 109 FERC ¶ 61,154 at 61,631 (2004)). But the Forward Market, which is the ultimate product of the settlement, includes

---

[6] The petitioners also argue that FERC acted arbitrarily and capriciously in ordering an overbroad remedy to the market problem it had identified. According to the petitioners, the ongoing use of Reliability Must-Run contracts during the transition period contravenes FERC's initial desire to implement a market structure to replace Must-Run contracts. This objection was not raised before the agency and is therefore waived. *See* 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.").

locational pricing.[7]  Hence, the settlement does satisfy FERC's initial concern about non-locational pricing.  *See* 115 FERC at 62,322 ("The locational feature in the [Forward Market]. . . appropriately addresses on a long-term basis issues regarding payments to capacity in constrained regions."); 117 FERC at 61,720 ("In the June 16 Order, we concluded that the [Forward Market] itself appropriately recognizes location."); *see also* 115 FERC at 62,325 (accepting the locational feature of the Forward Market).  The fact that the transition period lacks a locational component does not change the fact that the ultimate result of the settlement proceedings is a new market structure that does account for location.

Maine PUC's specific contention is that separate prices are warranted for Maine during the transition period because Maine has a capacity surplus and is export constrained (so that it would experience lower capacity prices in an actual market).  It maintains that FERC refused to consider the evidence that it presented to support this contention.  But FERC did consider Maine's argument that it should pay lower transition payments because of its capacity surplus.  The Commission offered two interrelated reasons for its conclusion that the transition payments should not have a locational component. First, FERC cited record evidence that projected "little to no variability in capacity prices across New England regions for the period covered by the transition mechanism."  115 FERC at 62,322.  Second, to the extent that import constraints do exist in other areas of New England, thereby creating a need for additional capacity, FERC noted that Reliability Must-Run agreements had

---

[7] For the Forward Market, capacity is purchased three years in advance, so the full market design, including the locational element, cannot be implemented until 2010.

already been approved and would continue during the transition period, with the costs for these contracts paid locally. *Id.*

To be sure, Maine PUC offered some contradictory evidence about capacity price variability, *see, e.g.*, J.A. 1941-47 (Supplemental Affidavit of Thomas D. Austin), but FERC's orders do "not lack substantial evidence simply because petitioners offered some contradictory evidence," *Ariz. Corp. Comm'n v. FERC*, 397 F.3d 952, 954 (D.C. Cir. 2005) (internal quotation marks omitted). FERC was entitled to reject Maine PUC's evidence and to base its conclusion on different evidence in the record. *See, e.g.*, *Elec. Consumers Res. Council*, 407 F.3d at 1236 ("[T]he court defers to the Commission's resolution of factual disputes between expert witnesses."); *see also Fla. Mun. Power Agency*, 315 F.3d at 368.

Maine PUC insists that FERC cannot rely on the rationale that price separation between Maine and the rest of New England was unsupported by the record. Although FERC did rely on this rationale in its initial order, Maine PUC claims that the Commission abandoned it in its order on rehearing. According to Maine PUC, on rehearing FERC refused to consider data presented by the petitioners and instead found that it was irrelevant whether Maine was export constrained. But despite somewhat infelicitous language in its rehearing order, FERC did not abandon the findings and conclusions of its initial order. To the contrary, the rehearing order first discussed both the evidence presented by Maine PUC, including Dr. Austin's affidavits, and the data and arguments in the record that contradicted this evidence. *See* 117 FERC at 61,722-23; *see also id.* at 61,724 ("The Commission did consider arguments presented in Dr. Austin's affidavits in approving the Settlement Agreement."). FERC's subsequent statement that the "issue of Maine being export-constrained is not the subject of this

proceeding," *id.* at 61,724, did not undo all of that previous discussion. Rather, it merely clarified that the question of whether Maine was export constrained was relevant only insofar as it affected FERC's determination of reasonable rates; it was not an independent question before the Commission. *See id.*

Finally, Maine PUC challenges FERC's denial of a motion that it filed on September 8, 2006, following the Commission's initial June 16 order. By that motion, Maine PUC sought to lodge the Department of Energy's National Electric Transmission Congestion Study, which Maine PUC argued supported its claim that the transition payments should be locational. We accord the Commission "broad discretion in fashioning hearing procedures," *Mich. Consol. Gas Co. v. FERC*, 883 F.2d 117, 125 (D.C. Cir. 1989) (quoting *Lyons v. Barrett*, 851 F.2d 406, 410 (D.C. Cir. 1988)), and find no abuse of discretion here. The motion at issue was filed nearly three months after FERC's decision approving the settlement, and FERC acted reasonably in holding that it "would be inappropriate to accept evidence at this extremely late date in this proceeding (after a dispositive order has been issued), since it would effectively deny parties the opportunity to respond to the evidence." 117 FERC at 61,724. FERC similarly denied untimely motions to intervene by Bridgeport Energy, LLC and Casco Bay Energy Company, LLC, which had been filed several weeks before Maine PUC's motion. *See id.* at 61,715.

Accordingly, we reject all of Maine PUC's attacks on FERC's decision to accept non-locational pricing during the transition period.

**IV.**

Section 4.C of the settlement agreement provides that the transition payments and the final prices from the Forward Market auctions will be reviewed under the "public interest" standard rather than the "just and reasonable" standard. 115 FERC at 62,333. This is more than a matter of semantics: the public interest standard is "much more restrictive" than the just and reasonable standard, which means that the settlement agreement makes it harder to successfully challenge the transition payments and Forward Market auction prices. *Wisc. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 271 (D.C. Cir. 2007) (citation omitted). The agreement states that the public interest standard will apply to all future challenges to the transition payments and final auction prices "whether the change is proposed by a Settling Party, a non-Settling Party, or the FERC acting *sua sponte*." 115 FERC at 62,333. Petitioners – who were not parties to the settlement agreement – assert that this provision will deprive them of their statutory right to challenge rates under the "just and reasonable" standard. We agree, and we grant the petition for review on this issue.

\* \* \*

Under the *Mobile-Sierra* doctrine, "FERC may abrogate or modify freely negotiated private contracts that set firm rates or establish a specific methodology for setting the rates for service . . . only if required by the public interest." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 14 (D.C. Cir. 2002). This doctrine recognizes the superior efficiency of private bargaining, and its purpose is "to subordinate the statutory filing mechanism to the broad and familiar dictates of contract law." *Borough of Lansdale v. FPC*, 494 F.2d 1104, 1113 (D.C. Cir. 1974). Thus, when the parties to a rate dispute reach a contractual settlement,

FERC must enforce the terms of the bargain unless the public interest requires otherwise – that is, unless the negotiated rates "might impair the financial ability of the public utility to continue its service, cast upon other customers an excessive burden, or be unduly discriminatory." *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956). In the instant case, we are presented with a question of first impression: may the Commission approve a settlement agreement that applies the highly-deferential "public interest" standard to rate challenges brought by non-contracting third parties? We think not.

Section 206 of the Federal Power Act provides: "Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification . . . is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate . . . and shall fix the same by order." 16 U.S.C. § 824e(a). In other words, when a party files a complaint against a rate or charge, FERC must adjudicate the challenge under the "just and reasonable" standard. The *Mobile-Sierra* doctrine carves out an exception to this rule based on the "familiar dictates of contract law." *Lansdale*, 494 F.2d at 1113. When two or more parties reach a negotiated settlement over a disputed rate, FERC applies a strong presumption that the settled rate is just and reasonable, and the Commission may only set aside the contract for the most compelling reasons.[8] The purpose of the *Mobile-Sierra* doctrine is "to preserve the

---

[8] As one commentator has noted, the *Mobile-Sierra* doctrine "recognize[s] that the existence of a contract infuses the rate with the attribute of reasonableness . . . ." Carmen L. Gentile, *The* Mobile-Sierra *Rule: Its Illustrious Past and Uncertain Future*, 21 ENERGY L.J. 353, 357 (2000).

benefits of the parties' bargain as reflected in the contract, assuming that there was no reason to question what transpired at the contract formation stage." *Atl. City*, 295 F.3d at 14. For example, in the *Sierra* case, Pacific Gas & Electric (PG&E) had surplus hydroelectric power, which it sold to Sierra Pacific Power Company at a very low rate. 350 U.S. at 351-52. When the surplus power was no longer available, PG&E – with the Commission's approval – reneged on its contract and increased Sierra's rates. *Id.* at 352. The Supreme Court held for Sierra, stating that "neither PG&E's filing of the new rate nor the Commission's finding that the new rate was not unlawful was effective to change PG&E's contract with Sierra." *Id.* at 353. The Court required the Commission to apply the highly-deferential "public interest" standard of review to challenges to contractually-established rates, in order to preserve the terms of the parties' bargain. *Id.* at 355; *see also Lansdale*, 494 F.2d at 1107-14 (holding that FERC may not approve a utility's breach of a settled rate contract unless the contract rates "contravened the public interest").

Courts have rarely mentioned the *Mobile-Sierra* doctrine without reiterating that it is premised on the existence of a voluntary contract between the parties. In *Mobile*, the Supreme Court stated that "the relations *between the parties*" may be established by contract, subject only to "public interest" review. *United Gas Pipeline Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 339 (1956) (emphasis added). Similarly, this Court has emphasized that the deferential public interest standard only applies to "*freely negotiated private contracts* that set firm rates or establish a specific methodology for setting the rates for service." *Atl. City*, 295 F.3d at 14 (emphasis added); *see also Maine PUC v. FERC*, 454 F.3d 278, 283-84 (D.C. Cir. 2006); *Richmond Power & Light v. FPC*, 481 F.2d 490, 493 (D.C. Cir. 1973) ("The contract between the parties governs the legality of

the filing.").

This case is clearly outside the scope of the *Mobile-Sierra* doctrine. As we explained, *Mobile-Sierra* is invoked when "one party to a rate contract on file with FERC attempts to effect a unilateral rate change by asking FERC to relieve its obligations under a contract whose terms are no longer favorable to that party." *Maine PUC*, 454 F.3d at 284. Here, the settling parties are attempting to thrust the "public interest" standard of review upon non-settling third parties who have vociferously objected to the terms of the settlement agreement. As the Supreme Court has noted, "[i]t goes without saying that a contract cannot bind a nonparty." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). The *Mobile-Sierra* doctrine applies a more deferential standard of review to preserve the terms of the bargain as between the contracting parties. *Atl. City*, 295 F.3d at 14. But when a rate challenge is brought by a non-contracting third party, the *Mobile-Sierra* doctrine simply does not apply; the proper standard of review remains the "just and reasonable" standard in section 206 of the Federal Power Act.

In defense of the *Mobile-Sierra* provision, FERC argues that the "public interest" standard will only apply to future challenges to a narrow category of rates: the transition payments and the final auction clearing prices from the Forward Market. 115 FERC at 62,335. This is not persuasive. It is equivalent to arguing that FERC will use an illegal standard sparingly. Despite the "limited" applicability of the public interest standard, FERC's approval of this agreement still deprives non-settling parties of their statutory right to have rate challenges adjudicated under the "just and reasonable" standard. And in any event, we are skeptical of FERC's characterization of the *Mobile-Sierra* provision as "narrow" or "limited." As petitioners' counsel noted at oral argument, if circumstances

change after a rate has initially been approved by the Commission, then (under the settlement agreement) subsequent challenges to that rate would be reviewed under the public interest standard. Recording of Oral Arg. at 29:25-31:20. The *Mobile-Sierra* provision thus departs from the usual "just and reasonable" standard and makes it harder for petitioners to successfully challenge rates in cases of changed circumstances.[9]

FERC also argues that in other recent cases, the Commission has approved contracts that apply the "public interest" standard to non-contracting third parties. 117 FERC at 61,727 n.103. This may show that the Commission's policy has been consistent – although even FERC concedes that is so only since 2002 – but it does not necessarily support the policy's legality, since none of the cited orders have been subject to judicial review on the *Mobile-Sierra* issue. FERC states that "there is no Commission or court precedent that supports a finding that a non-signatory may unilaterally seek changes to a *Mobile-Sierra* 'public interest' contract under the 'just and reasonable' standard of review." 115 FERC at 62,335 (citation omitted). It could just as easily be said that there is no "court precedent" that supports altering third parties' statutory rights based on a contract that they refused to sign. Moreover, while FERC can find no "precedent" in support of petitioners' arguments, the relevant statutory language is quite clear: section

---

[9] FERC asserts that third parties' interests are adequately safeguarded because under *Mobile-Sierra*, the Commission "retains significant authority to protect non-parties to the settlement from harm." 115 FERC at 62,335. But whatever comfort third parties might derive from FERC's continued ability to defend their interests, the existence of such powers does not justify derogation of the statutory right to "just and reasonable" review of rates.

206 of the FPA states that "upon complaint" the Commission must determine whether the challenged rate is "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a). Lastly, FERC argues that the *Mobile-Sierra* provision is necessary to promote price certainty and contract stability. As explained above, the *Mobile-Sierra* doctrine is designed to ensure contract stability *as between the contracting parties – i.e.*, to make it more difficult for either party to shirk its contractual obligations. *Atl. City*, 295 F.3d at 14. It makes no sense to say that the values of "stability" and "certainty" are furthered by applying the deferential standard of review to the eight parties that *refused* to agree to the terms of the settlement.

## V.

Petitioners also contend that FERC's approval of the Forward Market exceeds the Commission's jurisdiction because it forces utilities to purchase a specific amount of capacity. Petitioners assert that FERC lacks jurisdiction under the Federal Power Act, which provides that the Commission "shall not have jurisdiction . . . over facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). In response, FERC argues that the settlement agreement only addresses prices, which are unquestionably within FERC's jurisdiction. The Commission's interpretation of the scope of its jurisdiction is entitled to *Chevron* deference. *Okla. Natural Gas Co. v. FERC*, 28 F.3d 1281, 1283-84 (D.C. Cir. 1994).

We agree with the Commission that the Forward Market itself does not exceed FERC's jurisdiction. The Federal Power Act grants the Commission broad authority over "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). The protracted litigation over Must-Run

agreements, the locational installed capacity market, and the Forward Market is fundamentally a dispute over the *rates* that will be paid to suppliers of capacity. The two key components of the settlement agreement – the transition payments and the Forward Market auctions – "establish a mechanism and market structure for the *purchase and sale* of installed capacity at wholesale . . . [and] determine the *prices* for those sales." 115 FERC at 62,339 (emphasis added). Of course, it is a basic principle of economics that prices affect supply – the auction clearing prices in each sub-region of New England will certainly influence the amount of capacity that generators are willing to supply. Indeed, one of the primary purposes of the new market mechanism is to "provide[] incentives to attract new infrastructure where needed." *Id.* at 62,316. But an incentive is not a mandate. The mere fact that the Forward Market will encourage new supply does not mean that it *regulates* "facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). Rather, the Forward Market is designed to address pricing issues, which fall comfortably within FERC's statutory authority over "the sale of electric energy at wholesale in interstate commerce." *Id.* We have previously held that the Commission has jurisdiction over a "deficiency charge" that was imposed upon transmission providers who failed to procure a specified amount of capacity:

> The deficiency charge . . . must be deemed to be within the Commission's jurisdiction because it [ ] represents a charge for the power and service the overloaded participant receives – or it is at least a rule or practice affecting the charge for these services.

*Municipalities of Groton v. FERC*, 587 F.2d 1296, 1302 (D.C. Cir. 1978).

In support of their jurisdictional argument, petitioners focus heavily upon the "installed capacity requirement," which is "the total amount of capacity required by the system to meet peak load plus a reserve margin." 115 FERC at 62,338-39 n.177. This requirement ensures that transmission providers have procured enough capacity to maintain the reliability of the grid. Under the settlement agreement, transmission providers must purchase at least enough capacity in the annual auctions to meet their installed capacity requirements. *Id.* at 62,307. The Forward Market simply takes the capacity requirement as a given and uses it as an input into the auction mechanism. As FERC explained, "[the Forward Market] only establishes a market design for determining capacity charges; it does not alter [the capacity requirement] or in any way determine the appropriate amount of capacity that must be available." 117 FERC at 61,730. Rather, the capacity requirement is computed by ISO-New England in conjunction with a regional standard-setting body. 115 FERC at 62,338-39 n.177. To be sure, the methodology for calculating the installed capacity requirement is part of the ISO's tariff, and must be filed with the Commission for approval. *See ISO New England, Inc.*, 120 FERC ¶ 61,234 at 61,974-75 (2007). To the extent petitioners believe they are aggrieved by the ISO's installed capacity requirement, and more specifically, FERC's approval of that requirement on jurisdictional grounds, they may challenge that agency action. In fact, petitioners have already filed such a suit. *Conn. Dep't of Public Util. Control v. FERC*, No. 07-1375 (D.C. Cir. filed Sept. 19, 2007). But the Forward Market does not exceed FERC's jurisdiction merely because it incorporates the exogenously-determined installed capacity requirement into the auction mechanism. We thus deny the petition for review with respect to the jurisdictional issue.

## VI.

For the aforementioned reasons, the consolidated petitions for review are granted with respect to the *Mobile-Sierra* issue, denied with respect to all other issues, and remanded to the Commission for further proceedings.

*So ordered.*